## No. 16,688.

EITEL ET AL. *v*. ALFORD ET AL.
(257 P. [2d] 955)

Decided April 13, 1953.   Rehearing denied May 25, 1953.

341

Mr. JOHN C. YOUNG, Mr. JOHN C. YOUNG, JR., Mr. RUSH L. YOUNG, for plaintiffs in error.

Messrs. SNYDER & TULLIS, for defendants in error Alfords.

Mr. ROBERT L. SPURGEON, Mr. ROBERT H. LA GRANGE, for defendant in error Colorado Springs National Bank.

*En Banc.*

MR. JUSTICE CLARK delivered the opinion of the court.

ISAAC ALFORD and Georgia Alford, husband and wife, instituted this action against Paul T. Eitel and Mildred L. Eitel, his wife, upon their joint promissory note, and

to foreclose, as real estate mortgages, two deeds of trust covering lands in El Paso and Elbert counties. These lands, Eitel had purchased from Alfords; the note represented the unpaid balance of the purchase price; and the deeds of trust were to secure payment of said note, with interest and charges thereon. Plaintiffs also demanded judgment against defendants in remuneration of the 1948 taxes levied against said lands which became delinquent in 1949 and were paid by plaintiffs.

Defendants admit the execution of the promissory note and that no part of the principal thereof had been paid; denied that said note and deeds of trust securing same were properly in possession of plaintiffs; affirmatively allege that said documents had been wrongly delivered to plaintiffs by The Colorado Springs National Bank; assert that said bank had supervised the transactions between Alfords and Eitels relative to the purchase of the said lands and that the documents relating to that transaction had been improperly handled by said bank in various details, the particulars of which will hereinafter more clearly appear, and that by reason of these things defendants are without liability on said note. By way of counterclaim to the complaint, defendants demanded rescission of the purchase contract and cancellation of said note and deeds of trust; or in the alternative, if their demand for rescission be denied, that they have judgment by way of damages for all amounts paid pursuant to said contract. The Eitels also filed their third-party complaint against the Colorado Springs National Bank by which they seek judgment for damages against said bank in the sum of $21,450.00.

We will herein refer to the Alfords, who were plaintiffs in the original proceeding, as plaintiffs or as Alfords, or, if Isaac Alford alone is mentioned, he will be designated as Alford. Reference will be made to the Eitels as defendants or as Eitels, and to Paul T. Eitel as Eitel. The Colorado Springs National Bank will be designated as bank.

Upon trial in the district court without a jury, judgment was entered in favor of the plaintiffs against Eitels in the sum of $56,493.21, and foreclosure of the trust deeds as real estate mortgages was directed. Defendants' third-party complaint against the bank was dismissed.

As alleged grounds for reversal of plaintiffs' judgment against them, defendants present twenty-two separate specifications of points, together with thirteen additional specifications pertaining to the third-party proceeding by defendants against the bank, a total of thirty-five separate specifications. Obviously we may not treat each of these specifications separately, but we shall undertake to cover each and all of the contentions presented thereby in our further discussion of the case.

It also is true that, in the main, the facts of the case may be better presented in connection with the discussion of the legal points raised, than is possible by any preliminary summary. Suffice it to say at this point, that in the spring of 1947 the Eitels came to Colorado Springs from Clovis, New Mexico, with the object in view of buying farm lands. May 1st, 1947, at the suggestion of a man whom they met in Colorado Springs, they went to look at the farm belonging to the Alfords near Simla, Colorado. On that day Alfords showed Eitel over the place, and he and his wife returned thereto the following day and they and the Alfords reached an agreement as to the price, of fifty dollars per acre, or a total of $64,000.00. That they then went to the bank at Colorado Springs where they discussed the matter with Mr. Hemenway, as a result of which Mr. Hemenway offered them the services of the bank's attorney to draw up a sale and purchase contract. This contract was prepared during the noon hour; the parties returned to the bank around 2:00 o'clock on the afternoon of that day, and read and considered the drafted contract prepared by Mr. Spurgeon, the bank's attorney, who, however, was not present at that time. The contract thereupon

was executed in duplicate by both Alfords and Eitel, the latter at that time making a down payment of two thousand dollars as provided by the terms of the contract. At this meeting a Mr. Lockmiller, a friend of Eitel who had accompanied him on his trip to Colorado, suggested that he should have an attorney examine the abstracts of title. Upon request for information concerning attorneys, Mr. Hemenway mentioned the name of Mr. Mobley, and Alford that of Mr. Snyder, and Eitel chose Mr. Mobley. As a means of working out the mechanics of the transaction, it then was agreed that Alford should bring the abstracts of title to the bank; that the bank would see that they were properly extended and brought down to date, and deliver them to Mr. Mobley for examination and preparation of the title opinions thereon. Other pertinent facts will be recited in our consideration of the case.

Following the introduction of all evidence in the case it appears that counsel for both plaintiffs and defendants submitted requested findings of fact and conclusions of law for consideration of the trial court, who then took the matter under advisement and in due time entered its findings of fact, conclusions of law, and separate judgments, in both of which was an order dispensing with the filing of motions for a new trial. The record does not disclose which of the tendered findings and conclusions were adopted, or which disregarded, by the court. Motion for new trial was not filed, but within ten days following the entry of the judgments and decrees, the defendants filed their motion under Rule 52, R.C.P. Colo., in which they requested that the court add two additional findings in both cases; ten separate additional findings in each set of findings of fact; seventeen additional conclusions of law to be entered in either one or the other or in both of said proceedings; and that the judgments and decrees be amended accordingly. This motion was denied by the court, and a considerable number of defendants' specifications of alleged

error here relate thereto. Most of the matters to which these requests were directed will be discussed later, but again we state that it is impracticable to take up each of the points individually.

Sub-section (b) of Rule 52, supra, authorizing the filing of a motion to amend or make additional findings, should be regarded similarly to a motion for a new trial. It does not require the trial court to act singly upon each of the proposed changes, additions, or modifications, nor to state any reason for its ruling thereon. The trial judge may decline to adopt any thereof by simply denying the motion, and if he believes that his findings and conclusions, already announced, are proper and sufficient, his denial of the motion without explanation is not error. It may well be, as contended by counsel for defendants in this case, that the announced findings and conclusions of the trial judge are in some respects confusing, or difficult of understanding; nevertheless, if on the whole his findings and conclusions are supported by the record, they are sufficient to justify the pronounced judgment. We may even go further by recalling a rule so well established that it needs no citation of authority, that where the judgment of the trial court is correct and supported by the record, on review, it must be sustained notwithstanding the reasons given therefor are incorrect.

With few exceptions, all of defendants' specifications of alleged error spring from, or bear direct relation to, the theory of defendants' counsel in presenting their cause at the time of trial. On behalf of defendants it is contended: (1) That by the sale and purchase contract of May 2, 1947, the Alfords agreed and became obligated to deliver to Eitel a marketable title to the lands covered thereby, free and clear of all liens and encumbrances; (2) That said contract is executory in character and that the obligation to furnish marketable title is a continuing one, for the reason that the

abstracts disclose defects in title to certain portions of said lands; (3) That the condition of said title was known to plaintiffs and the bank, but unknown to defendants; (4) That the bank agreed to hold defendants' note and deeds of trust until it should be determined that the title to all of said lands was in marketable condition, and that it had no right or authority to deliver said documents until that condition was met; (5) That knowing of said title defects, and contrary to its promise, the bank did deliver said documents to Alford; (6) That said delivery was wrongful, of no legal effect, and that Alford was not entitled to said instruments under the terms of his contract until he had established merchantable title to all of said lands; (7) That defendants had not, expressly or impliedly, waived any of their rights under said contract; (8) That the clearing of title to all of the lands involved was a condition precedent to any demand by Alfords upon defendants, and such not having been performed, the foreclosure action was prematurely commenced; (9) That since there could be no enforcible demand made upon defendants until Alfords had complied fully with said condition precedent, defendants are not barred from relief from their contract by way of rescission or damages, whichever in the view of the court would be most equitable under the circumstances.

With no little surprise, we note that throughout the trial, court and counsel obviously construed the contract as containing a specific covenant and promise on the part of the Alfords to insure a completely clear and marketable title. Instances appear in this record where witnesses were requested and, on at least one occasion, required, to testify over objection concerning matters of intention and the understanding of the parties of the terms of the contract. The contract itself is clear and unambiguous and at this point will be carefully analyzed.

The first paragraph provides that the Alfords, as

parties of the first part, agree to sell and Eitel, as party of the second part, agrees to purchase, certain described lands in El Paso and Elbert counties "excepting and reserving, however, unto the said parties of the first part fifty (50) per cent of all oils and gases upon, in or under the said lands, or any part thereof, together with the right to enter upon the said lands or any part thereof," for exploration and drilling operations. The agreed purchase price was sixty-four thousand dollars, two thousand dollars being paid down at the time of the execution of the contract, receipt of which was acknowledged thereby. Then follows the paragraph that goes to the hub of this controversy: "The parties of the first part agree to deliver to the party of the second part, for inspection and examination, abstracts of title to the lands situate in El Paso county, Colorado, duly certified to by the Security Abstract and Title Company, and abstracts of title to the lands situate in Elbert county, Colorado, duly certified to the ———— day of ————, 1947, by the Elbert County Abstract & Title Company. In the event said abstracts show good and merchantable titles in the parties of the first part, then and in that event, the sum of FIFTEEN THOUSAND DOLLARS ($15,000.00) shall be paid on or before the 25th day of July, 1947, and the party of the second part agrees to execute his promissory note dated July 25, 1947 in the sum of FORTY-SEVEN THOUSAND DOLLARS ($47,000.00) with interest thereon at five per cent (5%) per annum, due on or before October 15, 1957, the principal of said note to be payable in annual installments of Four Thousand Seven Hundred Dollars ($4,700.00), or more, plus interest, from July 25, 1947, the first installment to be paid October 15, 1948, and subsequent installments to be payable on the 15th day of October in each and every year thereafter until the 15th day of October, 1957, at which time the unpaid balance shall become due and payable. Said note to be secured by a Deed of Trust on said

lands lying in both Elbert County and El Paso County, Colorado. Said note and deed of trust shall be delivered to the parties of the first part at the time the parties of the first part deliver to the party of the second part a good and proper warranty deed, conveying said premises, together with the aforesaid stock certificates, properly endorsed, for transfer to the party of the second part."

■ The next paragraph provides that, "taxes for the year 1947 due and payable in 1948, and the unexpired insurance premiums, shall be pro-rated, as of the date of delivery of possession of the premises October 20, 1947." From the foregoing it clearly appears that the Alfords specifically agreed only, (1) to sell; and, (2) to deliver *"for inspection and examination" abstracts properly extended and certified.* It is not stipulated in any part of said contract that the abstracts *shall show* clear and marketable title. By this statement we do not mean to be understood as saying that the party of the second part was unprotected by the contract in insisting upon clear and marketable title, but it devolved upon him to say when, and if, the title was satisfactory to him, and if not, then to decline further performance under the contract until the titles were perfected. The payment of the fifteen thousand dollars and the execution of the promissory note and trust deeds are *conditioned* and could have been required by parties of the first part only *"in the event* said abstracts show good and merchantable titles in the parties of the first part, *then and in that event."* (Emphasis supplied)

The Eitels, having become confused as to the date, came to Colorado Springs on July 21st, 1947, ready to close the transaction. They picked up the Alfords at the ranch, and all went to town together. Upon arriving at the bank, it developed that the abstracts had not been examined, in fact, had not even been delivered to the abstract companies for extension. The evi-

dence at this point is slightly conflicting, and while it may have been that somewhat impressive suggestions were made that the parties proceed with the program regardless of the fact that title opinions had not been rendered, certainly it is very clear that no demand on the part of the Alfords, or in their behalf, was made. The exercise of reasonable business prudence on the part of Eitels at that time would have dictated that they should not proceed until their attorney had had an opportunity to complete the examination of the abstracts. Nevertheless, with no knowledge as to the condition of the titles, and without the advice of their counsel, they proceeded voluntarily to pay over the sum of fifteen thousand dollars; executed their joint promissory note in the sum of $47,000; together with the deeds of trust, securing said promissory note. At that time, without objection, they observed (and Eitel admits this in his testimony), Alford endorse the $15,-000 check, hand it to Mr. Hemenway, who then and there made out a deposit slip for immediate deposit thereof to the credit of Alford's account.

With respect to the deeds of trust, there also is some conflict in the evidence, Eitel claiming, without being specific in his testimony as to the exact language used, that Mr. Hemenway, on behalf of the bank, agreed to withhold delivery of said note and deeds of trust until it was determined that the title to the lands was in clear and marketable condition. Mr. Hemenway testified positively that he made no such agreement and that no such conversation occurred. Other evidence in the record is to the same effect, and the trial court so found. At that time Alfords had not executed their deeds. From the acknowledgments thereon, it appears that both deeds were executed on the 11th day of October, 1947. Exactly when they were delivered into possession of the bank is uncertain, but probably shortly after the date of their execution. It is clearly apparent that the bank caused both warranty deeds from the Al-

fords, and the trust deeds back from the Eitels, to be recorded, the instruments concerning the El Paso county lands having been recorded on November 19th and those to the Elbert county lands on the 21st, 1947. The bank was not acting as an escrow holder and had no specific instructions concerning these documents, but it did have in its possession a copy of the contract in which it was provided that, "said note and deed of trust shall be delivered to the parties of the first part at the time the parties of the first part deliver to the party of the second part a good and proper warranty deed conveying said premises."

The abstracts were certified late in August, 1947, and delivered to Mr. Mobley, who wrote opinions concerning them September 10 and 11, 1947. Since the abstracts had come from the bank, the title opinions were addressed to and returned to it. Frequent reference is made in the record, and in the briefs, to 160 acres being held under tax title. Mr. Mobley's opinion shows title to 120 acres to have been derived through a treasurer's deed on tax sale, concerning which he said that, until November 25, 1951, the title thereto "must be considered defensive." The other alleged title defect is that certain of these lands were subject to oil and gas leases, the primary term of which had not expired at the date of the execution of said contract.

■ With respect to the oil and gas leases, they were discussed between Alford and Eitel on May 1, 1947, and there is no question but that defendant was perfectly willing to accept title subject to said leases, which the trial court found as a fact. Vehement exception is taken, however, to paragraph 15 of said lease form, it being contended that thereby said leases become permanent clouds upon the titles, in that they could not be extinguished without legal action. Concerning this, counsel are clearly mistaken, as paragraph 15 relates only to forfeiture, which, it is stipulated, may not be declared on account of failure in performance of *im-*

*plied* covenants without judicial determination. This has nothing whatsoever to do with the primary term of the lease, or the covenants therein contained with respect to the payment of rent and the drilling of wells.

Concerning the tax title to 120 acres, the court found that it was, and for our purposes it properly may be considered as, a cloud, which, upon demand made within proper time, Alford definitely could have been required to have cleared.

Apparently it was contemplated at the time of the making of the contract that the Eitels were to have possession on October 20, 1947, although the contract does not so specifically provide. The facts are, that they did move onto the ranch with the Alfords in September, and that they became exclusively possessed of the property in October. They never consulted their attorney about the condition of the titles; never asked the bank to see the title opinions; and they knew, or should have known, that the deeds had been recorded, because in their bank statement was a memorandum check and a deposit slip giving that information. Upon being questioned concerning these matters Eitel attempted to excuse his lack of ordinary diligence simply by saying that he was busy and that Mr. Hemenway told him on different occasions, "that everything was all right and to go on about his work."

The first payment on the promissory note became due October 15, 1948, and defendants did not have the funds with which to take care of it. At that time they owed the bank on notes for money they had borrowed from it, and they paid the bank in preference to making a payment on the Alfords' note. Later, the bank declined to let them have any additional money, and on March 15, 1949, upon quitting business at that bank, Eitel asked for all of his papers, which immediately were delivered to him. March 25, 1949, ten days after receiving from the bank all of his papers in connection with said lands, as well as papers the bank held for

him relating to business transactions in New Mexico, he and Alfords entered into an extension agreement whereby, upon payment of one year's interest at that time, the Alfords extended the date of payment of the installment of $4700 due on October 15, 1948, to the 15th of October, 1949.

We have detailed the foregoing facts at considerable length for the reason that thereby it is conclusively shown that by the date of commencement of this action, which was December 20, 1949, the defendants definitely had waived all rights they may ever have had theretofore, if any, to demand rescission, or damages, on account of the condition of title.

Notwithstanding all the confusion of issues and difficulties encountered at the trial, and also in the review of this cause, in the final analysis we have but a simple, unambiguous contract, concerning which the plaintiffs have long since performed all that they therein specifically covenanted to do: (1) To sell and convey by warranty deed, and (2) to furnish abstracts of title, certified down to date, "for inspection and examination." The contract, in and of itself and standing alone, was not voidable.

It is contended that, aside from the contract, Alford verbally agreed to cure the defect of the tax title in event Eitels wished to sell the ranch or for any other reason it became necessary to do so, and this the court found to be a fact. A peculiar circumstance arises under this issue. Alford admits that during a conversation at Mobley's office about the middle of September, 1947, he did make such a statement; Mrs. Alford testified to the same effect, and that her husband's promise was in response to a question by Mr. Mobley. Eitels deny that any such conference ever was held at Mobley's office. Mobley was under the impression that no such conference was held, but could not definitely remember, and would not commit himself positively concerning the matter. The trial court found that no such con-

ference was had. Unless Alford's verbal promise was made at such a conference in Mobley's office, which the court found did not occur, one may search the record from end to end and there is otherwise no evidence whatsoever of any such promise having been made on Alford's part. Alford testified, however, that he always stood ready to correct any title defects should demand have been made of him or should necessity require, but that no such demand ever was made. Eitel insists that he never knew of the tax title until well in the summer of 1949, and admits that he then made no demand on Alfords that it be cleared.

■ ■ Where one, for many months, has taken the fruits of his contract, he may not plead, in defense against liability thereunder, circumstances created through his own imprudence, nor claim ignorance of facts which it was his duty to know, and especially where, as here, the information was readily available. It was defendants' duty to have acquainted themselves with the conditions of titles to the land involved, and, further, should there have been objectionable defects, to promptly have demanded their correction. If, under any theory of this cause, rescission was at any time justifiable, the remedy was lost by reason of unreasonable delay in bringing action, when the facts were known, or readily ascertainable, and defendants were upon notice and under duty to inquire. *Young v. Leech,* 78 Colo. 208, 212, 240 Pac. 692. These principles apply even though, as was not the case here, the contract may have been the result of mutual mistake, or actual misrepresentation, fraud or deceit. Dozens of cases might be cited, of which we list only a few. *Hessell v. Neal,* 25 Colo. App. 300, 137 Pac. 72; *Gordon-Tiger Mining Co. v. Brown,* 56 Colo. 301, 138 Pac. 51; *Whitney v. Bissell,* 75 Ore. 28, 146 Pac. 141; *Halm v. Wright,* 63 Colo. 419, 168 Pac. 36; *Fabian v. Bell Corporation,* 55 Cal. App. (2d) 413, 130 P. (2d) 779; *Wark v. Bopp,* 119 Colo. 12,

199 P. (2d) 892; *Armijo v. Nuchols* (N. M.), 253 P. (2d) 317. These cases contain numerous citations of others equally applicable.

The trial court found that none of the dealings between Alfords and Eitels were guided or supervised by Mr. Hemenway or the bank; that said bank was not acting as escrow holder; that it was not to pass upon the condition of the title to the real estate involved; that it was never agreed on behalf of the bank to withhold from delivery to Alford the note and trust deeds until the abstracts were in such shape as to show a marketable title; and that said bank was in no way or manner answerable in damages. These findings are sufficiently supported by evidence appearing in the record in this case. The bank offered its services purely as a courtesy to the parties, without charge. Even if it be assumed that the negligent conduct of Eitel, with reference to his own business, was partially due to an unwarranted expectation that the bank would take care of his interests, regardless of his neglect of them himself, this situation certainly did not prevail after the bank delivered to Eitel all of his papers on March 15, 1949. When he made the extension agreement with Alford ten days thereafter, he thereby confirmed all previous transactions. The record is clear that the papers and documents in connection with the contract were held by the bank purely as an accommodation, and that Eitel could have obtained possession thereof at any time upon demand.

We have reviewed this entire record with great care. The fact that we have not separately discussed each and every specification, does not indicate that any thereof have failed of our serious consideration. It is our considered opinion that any trial errors appearing in this record redound to defendants' benefit and were against plaintiffs, and that the judgments of the trial court are predominantly correct, even though some of

the reasons assigned therefor in findings of fact and conclusions of law may be considered erroneous.

The judgments are affirmed.

MR. JUSTICE MOORE dissents.

MR. CHIEF JUSTICE STONE and MR. JUSTICE HOLLAND not participating.