Opinions of the Colorado Supreme Court are available to the
public and can be accessed through the Judicial Branch's
homepage at http://www.courts.state.co.us. Opinions are also
posted on the Colorado Bar Association's homepage at
http://www.cobar.org.

ADVANCE SHEET HEADNOTE
January 11, 2021

**2021 CO 2**

**No. 19SC234, *In re Estate of Yudkin* — Common Law — Divorce — Marriage and Cohabitation.**

In this case, the supreme court applies the updated common law marriage test announced today in *In re Marriage of Hogsett & Neale*, 2021 CO 1, __ P.3d __, emphasizing that a common law marriage finding depends on the totality of the circumstances, and no single factor is dispositive. The court determines that it is unclear from the record whether the parties mutually agreed to enter into a marital relationship. Moreover, the court notes that while the magistrate's treatment of certain evidence may have been appropriate under *People v. Lucero*, 747 P.2d 660 (Colo. 1987), it does not account for the legal and social changes to marriage acknowledged in *Hogsett*. The court therefore vacates the judgment of the court of appeals and remands with instructions to return the case to the probate court to reconsider whether the parties entered into a common law marriage under the refined test we announce today in *Hogsett*.

# The Supreme Court of the State of Colorado
2 East 14th Avenue • Denver, Colorado 80203

---

## 2021 CO 2

---

### Supreme Court Case No. 19SC234
*Certiorari to the Colorado Court of Appeals*
Court of Appeals Case No. 17CA1996

---

### In re the Estate of Viacheslav Yudkin, deceased.

### Petitioner:

Svetlana Shtutman,

v.

### Respondent:

Tatsiana Dareuskaya.

---

### Judgment Vacated
*en banc*
January 11, 2021

---

**Attorneys for Petitioner:**
Law Office of Leonard R. Higdon
Leonard R. Higdon
    *Greenwood Village, Colorado*

**Attorneys for Respondent:**
Bell & Pollock, P.C.
Bradley P. Pollock
Samuel A. Randles
    *Denver, Colorado*

**Attorneys for Amicus Curiae Colorado Legal Services:**
Maureen E. Terjak

Maeve Goodbody
Erin Harris
Casey Sherman
Rebecca S.S. Witte
        *Denver, Colorado*

**JUSTICE MÁRQUEZ** delivered the Opinion of the Court.
**CHIEF JUSTICE BOATRIGHT** concurs in the judgment only.
**JUSTICE SAMOUR** concurs in the judgment only.

¶1 When Viacheslav Yudkin died intestate, his ex-wife, Petitioner Svetlana Shtutman, was appointed personal representative of his estate. Respondent Tatsiana Dareuskaya sought Shtutman's removal, asserting that she (Dareuskaya) should have had priority for that appointment as Yudkin's common law wife. A probate court magistrate found that although Yudkin and Dareuskaya cohabitated and held themselves out to their community as married, other factors weighed against a finding of common law marriage, including that the couple did not file joint tax returns, own joint property or accounts, or share a last name. The court of appeals reversed the magistrate's order, concluding that the magistrate abused his discretion by misapplying the test for a common law marriage set out in *People v. Lucero*, 747 P.2d 660 (Colo. 1987). *Estate of Yudkin*, 2019 COA 25, ¶ 18, __ P.3d __. Shtutman petitioned this court for certiorari review, which we granted.[1]

¶2 Today, this court decides a trio of cases addressing common law marriage in Colorado. *See In re Marriage of Hogsett & Neale*, 2021 CO 1, __ P.3d __; *In re Marriage of LaFleur & Pyfer*, 2021 CO 3, __ P.3d __. In the lead case, *Hogsett*, we

---

[1] We granted certiorari to review the following issue:

1. Whether the court of appeals erroneously applied *People v. Lucero*, 747 P.2d 660 (Colo. 1987), in holding that decedent and respondent were married under common law at the time of decedent's death.

refine Colorado's common law marriage test to better reflect the social and legal changes that have taken place since *Lucero* was decided, acknowledging that many of the traditional indicia of marriage identified in *Lucero* are no longer exclusive to marital relationships, while at the same time, genuine marital relationships no longer necessarily bear *Lucero's* traditional markers. *Hogsett*, ¶¶ 2, 41–60.

¶3 Under the updated test, "a common law marriage may be established by the mutual consent or agreement of the couple to enter the legal and social institution of marriage, followed by conduct manifesting that agreement." *Id.* at ¶ 3. "The core query is whether the parties intended to enter a *marital* relationship—that is, to share a life together as spouses in a committed, intimate relationship of mutual support and mutual obligation." *Id.* While the factors we identified in *Lucero* can still be relevant to the inquiry, they must be assessed in context; the inferences to be drawn from the parties' conduct may vary depending on the circumstances. *Id.* As we make clear in this case, a common law marriage finding depends on the totality of the circumstances, and no single factor is dispositive.

¶4 Here, it is unclear from the record whether the magistrate found that Yudkin and Dareuskaya mutually agreed to enter into a marital relationship. Further, the magistrate's treatment of certain evidence—such as the fact that the parties maintained separate finances and property, and that Dareuskaya never took Yudkin's name—may have been appropriate under *Lucero*, but does not

4

necessarily account for the legal and social changes to marriage acknowledged in *Hogsett*. Finally, under both *Lucero* and *Hogsett*, the court of appeals division erred to the extent it suggested that evidence of Yudkin and Dareuskaya's cohabitation and reputation in the community as spouses mandated the conclusion that they were common law married regardless of any other evidence to the contrary. *See Yudkin*, ¶ 11.

¶5 For these reasons, we vacate the judgment of the court of appeals and remand with instructions to return the case to the probate court to reconsider whether the parties entered into a common law marriage under the refined test we announce today in *Hogsett*.

## I. Facts and Procedural History

¶6 Viacheslav Yudkin and Tatsiana Dareuskaya lived together in Yudkin's home for eight years, along with Dareuskaya's children from a prior relationship. Yudkin died suddenly and intestate. Svetlana Shtutman, Yudkin's ex-wife, sought appointment as the personal representative of his estate. Dareuskaya objected to the appointment and sought Shtutman's removal, asserting that she (Dareuskaya) was Yudkin's common law wife and should have had priority in appointment as personal representative of his estate under section 15-12-203(1)(b)–(e), C.R.S. (2020).

¶7     At a hearing before a magistrate to determine whether a common law marriage existed between Yudkin and Dareuskaya, Dareuskaya testified that over six years before his death, Yudkin presented her with a wedding ring and told her they could be husband and wife if she agreed; that she did agree; and that after that day she wore the ring and the couple held themselves out as married.

¶8     In addition to Dareuskaya's testimony, the magistrate considered testimony from Shtutman and many of Dareuskaya's and Yudkin's family members, friends, acquaintances, neighbors, and coworkers.  Except for Yudkin's father and Shtutman, everyone stated that they thought Yudkin and Dareuskaya were spouses, and some said they were surprised by this litigation.  Some testified that the pair wore what the witnesses assumed were wedding rings.  In contrast, Yudkin's father testified he was unaware of any ring exchange between the two.  The magistrate found most of the community members' testimony credible and was "convinced [Yudkin] and [Dareuskaya] agreed to and did hold themselves out to be married to the community of their non-family coworkers, friends and neighbors but family knew they were not ceremonially married."

¶9     The magistrate nevertheless concluded that other evidence weighed against a finding that a common law marriage existed.  For example, although the couple paid bills jointly, they maintained accounts in separate names.  There was no evidence that the couple had joint ownership of any vehicles, real estate, or credit

6

accounts. A car insurance policy covered both Yudkin and Dareuskaya but also covered Yudkin's father.

¶10 Notably, the magistrate found "extremely relevant" and "g[ave] tremendous weight" to the fact that Yudkin and Dareuskaya had filed their state and federal taxes separately in every year of their purported common law marriage, despite the fact that the IRS permits common law spouses to file jointly. Dareuskaya testified that they did not file joint returns because she believed she could not represent to the government that she was married. Based on this and other testimony, the court indicated several times that it thought Dareuskaya lacked credibility.

¶11 Ultimately, the magistrate concluded that Dareuskaya had not proven a common law marriage under the factors set forth in this court's decision in *Lucero*. There, we held that "[a] common law marriage is established by the mutual consent or agreement of the parties to be husband and wife, followed by a mutual and open assumption of a marital relationship." 747 P.2d at 663. Recognizing that "in many cases express agreements [to be married] will not exist," *id.* at 664, we set out a non-exhaustive list of factors that trial courts can consider to infer the parties' agreement to be married; namely, "maintenance of joint banking and credit accounts; purchase and joint ownership of property; the use of the man's surname by the woman; the use of the man's surname by children born to the

parties; and the filing of joint tax returns," *id.* at 665. Applying these factors here, the magistrate concluded that Yudkin and Dareuskaya were not common law married:

> [A]lthough [Yudkin] and [Dareuskaya] loved each other, agreed to and did cohabitate[] for at least 8 years and held themselves out to their co-workers, friends and neighbors as married[,] *they were not at the time of [Yudkin's] death [c]ommon [l]aw [m]arried* based specifically on the facts that they did not maintain joint banking or credit account(s); they did not purchase and jointly own any vehicles or real property; [Dareuskaya] did not use [Yudkin's] surname; the children of [Dareuskaya and Yudkin] did not use the other['s] surname nor were any child(ren) born between [Dareuskaya and Yudkin] to take the surname; and most convincing is they failed to file any joint Federal or State Tax Returns during the 8 years they were living together including for 2015 which was the last full tax year [Dareuskaya and Yudkin] were still living together.

(Emphasis added.)

¶12 Dareuskaya appealed, arguing, as relevant here, that the magistrate erred in concluding a common law marriage did not exist despite finding that the couple cohabitated and had a reputation in the community as married.

¶13 The court of appeals agreed and held that the magistrate misapplied *Lucero*. *Yudkin*, ¶¶ 8–18. The division interpreted *Lucero*'s statement that "[t]he two factors that most clearly show an intention to be married are cohabitation and a general understanding or reputation . . . that the parties hold themselves out as husband and wife," *id.* at ¶ 10 (emphasis omitted) (quoting *Lucero*, 747 P.2d at 665), to mean that where "there is an agreement to be married and the two essential

8

factors—cohabitation and a reputation in the community as husband and wife—are met, the inquiry ends there; a common law marriage has been established," and the court may not consider the parties' other conduct, *id.* at ¶ 11. The division reasoned that any other actions taken (or not taken) by the parties are legally irrelevant if those two essential factors are established, and that to conclude otherwise might dictate the existence of common law divorce, which Colorado does not recognize. *Id.* at ¶ 16 n.4.

¶14     Applying this interpretation of *Lucero* to the facts of this case, the division reasoned that "[o]nce the magistrate determined . . . that decedent and putative wife agreed to be married, cohabitated, and had a reputation in their community as husband and wife, the inquiry should have ended, and the magistrate was compelled to enter a decree of common law marriage." *Id.* at ¶ 15. The division thus reversed and remanded with directions to enter a decree of common law marriage. *Id.* at ¶ 18.

¶15     Shtutman petitioned this court for certiorari review, arguing that the court of appeals misapplied the *Lucero* test and that the magistrate never factually found that Yudkin and Dareuskaya agreed to be married. We granted certiorari review and heard arguments in *Yudkin* along with *Hogsett* and *LaFleur*, which are also announced today.

## II. Analysis

¶16 "A determination of whether a common law marriage exists turns on issues of fact and credibility, which are properly within the trial court's discretion." *Lucero*, 747 P.2d at 665. Accordingly, we review the magistrate's factual findings for clear error and his common law marriage finding for an abuse of discretion.

¶17 Shtutman argues that the division of the court of appeals erred by treating cohabitation and reputation in the community as necessarily dispositive of the parties' agreement to be common law married. We agree. In looking only to those few factors it deemed "essential," the division failed to appreciate the comprehensive nature of the common law marriage analysis.

¶18 As was true under *Lucero*, and remains true under *Hogsett*, courts must consider all factors that might manifest the parties' agreement, or lack of agreement, to be married. *Compare Lucero*, 747 P.2d at 665 ("[T]here is no single form that any such evidence [of agreement] must take. Rather, any form of evidence that openly manifests the intention of the parties that their relationship is that of husband and wife will provide the requisite proof from which the existence of their mutual understanding can be inferred."), *with Hogsett*, ¶ 50 ("Our refinement retains the core parts of the *Lucero* test: . . . a flexible inquiry into the totality of the circumstances that relies on the factfinder's credibility determinations and weighing of the evidence."). Moreover, although we noted in

10

*Lucero* that cohabitation and reputation in the community were "[t]he two factors that most clearly show an intention to be married," 747 P.2d at 665, we also made clear that evidence of cohabitation and reputation in the community do not create a presumption of a common law marriage, *id.* at 664 n.5.

¶19 As we clarify today in *Hogsett*, "a common law marriage may be established by the mutual consent or agreement of the couple to enter the legal and social institution of marriage, followed by conduct manifesting that mutual agreement." *Hogsett*, ¶ 49. "The key question is whether the parties mutually intended to enter a *marital* relationship — that is, to share a life together as spouses in a committed, intimate relationship of mutual support and mutual obligation." *Id.* While the factors we identified in *Lucero* can still be relevant to the inquiry, they must be assessed in context; the inferences to be drawn from the parties' conduct may vary depending on the circumstances. *Id.* Ultimately, a common law marriage finding depends on the totality of the circumstances, and no single factor is dispositive.

¶20 Here, the magistrate's findings are somewhat ambiguous regarding whether Yudkin agreed to be married to Dareuskaya. In summarizing Dareuskaya's testimony, the magistrate stated that "Yudkin gave [Dareuskaya] a wedding ring and said [the pair] could be husband and wife if she agreed. There was no planning or ceremony. . . . She agreed and she wore the ring all the time after that . . . ." Based on that testimony, the magistrate was "convinced Mr.

11

Yudkin and Tatsiana A. Dareuskaya *agreed to and did hold themselves out to be married* to the community of their non-family coworkers, friends and neighbors but family knew they were not ceremonially married." (Emphasis added.) Although it is clear from this statement that the magistrate was convinced Yudkin and Dareuskaya agreed to *hold themselves out* as married, it is unclear from the phrasing whether the magistrate separately concluded that Yudkin and Dareuskaya agreed to *be* married.

¶21 On remand, the district court must determine whether Yudkin and Dareuskaya in fact agreed to be married. In deciding whether the couple agreed to enter into a "*marital* relationship—that is, to share a life together as spouses in a committed, intimate relationship of mutual support and obligation," *Hogsett*, ¶ 3—the court must undertake a "flexible inquiry into the totality of the circumstances," *id.* at ¶ 50. In particular, the court "should accord weight to evidence of the couple's express agreement to marry." *Id.* at ¶ 54. "[I]n the absence of such evidence, the couple's mutual intent may be inferred from their conduct, albeit judged in context." *Id.* Relevant conduct includes, but is not limited to,

> cohabitation[;] reputation in the community as spouses[;] maintenance of joint banking and credit accounts[;] purchase and joint ownership of property[;] filing of joint tax returns[;] . . . use of one spouse's surname by the other or by children raised by the parties[;] . . . evidence of shared financial responsibility, such as leases in both partners' names, joint bills, or other payment records; evidence of joint estate planning, including wills, powers of attorney, beneficiary and emergency contact designations; . . . symbols of

12

commitment, such as ceremonies, anniversaries, cards, gifts, and the couple's references to or labels for one another[;] . . . [and] the parties' sincerely held beliefs regarding the institution of marriage.

*Hogsett*, ¶ 55–56. The court's analysis of these factors should also take into account the nuances of individuals' relationship or family histories, and their religious or cultural beliefs and practices. *See Hogsett*, ¶ 59 ("[T]he significance of a given factor will depend on the individual, the relationship, and the broader circumstances, including cultural differences.").

¶22 Here, if credited, Dareuskaya's testimony that Yudkin asked her to be his wife; that she accepted; and that he provided her with a ring could be evidence of the couple's express agreement to marry even without a more formal ceremony or the presence of some of the other supporting factors. *See id.* at ¶ 47 ("[Not] every marriage ceremony involve[s] an officiated exchange of vows before family and friends at a place of worship."). At the same time, under *Hogsett*, the facts that Dareuskaya and Yudkin did not share a last name and that Dareuskaya's children did not take Yudkin's last name no longer necessarily weigh against a finding of common law marriage. *See Hogsett*, ¶ 45 ("[T]here may be any number of reasons, including cultural ones, that spouses and children do not take one partner's name at marriage."). That Yudkin and Dareuskaya did not have children together who would take Yudkin's last name also does not weigh against a finding of common law marriage. *See id.* at ¶ 44 ("[J]ust as having shared biological or genetic children

13

is not an indicator of marriage, it is also not a requirement of marriage."). And although a couple's decision to maintain separate finances remains relevant, it is not necessarily indicative of the lack of the parties' intent to be married. *See id.* at ¶ 46 ("A couple's financial arrangements may also be less telling these days than before.").

¶23 The purpose of examining the couple's conduct is not to test the couple's agreement to marry against an outdated marital ideal, but to *discover* their intent. That is why under *Hogsett*, "the inferences to be drawn from the parties' conduct may vary depending on the circumstances," *Hogsett*, ¶ 49, and "the factfinder[] [must make] credibility determinations and weigh[] . . . the evidence" in context, *id.* at ¶ 50.

## III. Conclusion

¶24 For the foregoing reasons, we vacate the judgment of the court of appeals and remand with instructions to return the case to the probate court for its capable reconsideration in light of *Hogsett*. Dareuskaya's request for attorney's fees and costs is denied pursuant to this court's discretion under C.A.R. 39.1.

**CHIEF JUSTICE BOATRIGHT** concurs in the judgment only.
**JUSTICE SAMOUR** concurs in the judgment only.

CHIEF JUSTICE BOATRIGHT, concurring in the judgment only.

¶25 For the reasons stated in my concurrence in the judgment only to *In re Marriage of Hogsett & Neale*, 2021 CO 1, __ P.3d __ (Boatright, C.J., concurring in the judgment only), I disagree with the majority's decision to announce new factors for establishing common law marriage on the facts of that case. In so doing, the majority also potentially broadens the definition of marriage in a way that I fear will only further confuse the already complex concept of common law marriage. Therefore, I cannot join the majority in its discussion of the new factors or directions to apply the same on remand in this case. The new factors aside, however, I agree with the majority that a remand is appropriate here because "it is unclear from the record whether the magistrate found that [the parties] mutually agreed to enter into a marital relationship," maj. op. ¶ 4, and I would further direct the trial court to determine a specific date or at least an approximate timeframe for when the parties would have formed such an intent, if at all. Thus, I respectfully concur in the judgment only.

¶26 The intent to be married remains the central requirement for common law marriage under either *People v. Lucero*, 747 P.2d 660, 663 (Colo. 1987), or *Hogsett*, ¶ 3. Thus, an explicit finding about the parties' intent remains necessary to establish whether they entered into a common law marriage. The magistrate here did not make such a finding. The evidence on the record, meanwhile, reasonably

1

supports both a finding of intent to enter into a common law marriage and a finding of intent to enter into a non-marital relationship. On the one hand, the couple cohabitated and held themselves out as married. On the other hand, the couple maintained separate finances, did not file joint taxes, and the magistrate commented that they "knew they were not ceremonially married." Therefore, I agree with the majority that a remand is appropriate for the trial court to make a finding as to the parties' intent to be married.

¶27 The equivocal evidence on the record reinforces—as I explain in my concurrence in part to *In re Marriage of LaFleur & Pyfer*, 2021 CO 3, __ P.3d __ (Boatright, C.J., concurring in part and concurring in the judgment)—the importance of establishing a specific date or at least an approximate timeframe for when the parties would have formed a mutual intent to be married and, therefore, entered into a common law marriage. This will help inform the court and the parties as to what evidence is potentially relevant to the establishment of a common law marriage, particularly in cases where, as here, the parties' conduct could be found both consistent and inconsistent with marriage. Any conduct *after* the marriage began is not relevant to determining whether a common law marriage existed in the first place. Therefore, I would further direct the trial court to determine, if supported by the facts, a specific date or at least an approximate timeframe for when the parties would have formed an intent to be married.

¶28 Because the magistrate here made neither a finding as to the parties' intent to be married nor a finding about the specific date or approximate timeframe for when the parties would have formed such an intent, if at all, a remand is appropriate for these findings. Thus, I respectfully concur in the judgment only.

JUSTICE SAMOUR, concurring in the judgment only.

¶29    The majority correctly notes that "a common law marriage may be established" in Colorado "by the mutual consent or agreement of the couple to enter the *legal* and social institution of marriage, followed by conduct manifesting that agreement."  Maj. op. ¶ 3 (quoting *In re Marriage of Hogsett & Neale*, 2021 CO 1, ¶ 3, __ P.3d __, __) (emphasis added).  But in the next breath, the majority alters the first part of this test by explaining that what really matters is that the parties mutually "intended to enter a *marital* relationship—that is, to share a life together as spouses in a committed, intimate relationship of mutual support and mutual obligation."  *Id*.  Though the majority characterizes this last statement as merely identifying the test's "core query," conspicuously absent from it is the word "legal," as in mutual intent and agreement "to enter the legal . . . institution of marriage."  *Id.*  And, as my dissenting opinion in the companion case of *In re Marriage of LaFleur & Pyfer*, 2021 CO 3, __ P.3d __ (Samour, J., dissenting), demonstrates, the requirement of mutual intent and agreement to enter into a *legal* marital relationship can make a world of difference.  Yet, the majority nowhere gives that aspect of the test meaningful effect.  Indeed, for all intents and purposes, the majority retires it from consideration today.

¶30    To determine whether Yudkin and Dareuskaya were common law married, I would inquire whether they mutually intended and agreed to enter into the *legal*

1

relationship of marriage, and I would look for conduct manifesting that intent. In evaluating the parties' conduct, in turn, I would apply the factors from *People v. Lucero*, 747 P.2d 660 (Colo. 1987), as refined by the majority today in *Hogsett*. In the end, I would arrive at the same decision as the majority because in this case requiring mutual intent and agreement to *legally* marry versus merely requiring mutual intent and agreement to marry (whether legally or not) makes no difference. I therefore concur in the judgment only.