25CA1307 Parental Resp Conc IBL 03-05-2026

COLORADO COURT OF APPEALS

Court of Appeals No. 25CA1307
Prowers County District Court No. 24DR34
Honorable Tarryn L. Johnson, Judge

In re the Parental Responsibilities Concerning IBL, a Child,

and Concerning Amanda Nicole Vasquez,

Appellee,

and

Brian Lee Lucero,

Appellant.

JUDGMENT AFFIRMED IN PART AND REVERSED IN PART,
AND CASE REMANDED WITH DIRECTIONS

Division III
Opinion by JUDGE HARRIS
Dunn and Moultrie, JJ., concur

**NOT PUBLISHED PURSUANT TO C.A.R. 35(e)**
Announced March 5, 2026

No Appearance for Appellee

Brian Lee Lucero, Pro Se

¶ 1    In this domestic relations proceeding involving Brian Lee Lucero (father) and Amanda Nicole Vasquez (mother), father appeals the district court's judgment determining that the parties were not common law married, allocating parental responsibilities, setting his child support obligation, and denying his request for attorney fees.  We affirm the judgment in part, reverse it in part, and remand the case for additional proceedings.

## I.    Relevant Facts

¶ 2    In April 2024, mother filed a petition for the allocation of parental responsibilities (APR) for the parties' son.  Father agreed that an allocation was necessary but argued that the case should proceed as a divorce because the parties were common law married.

¶ 3    Within a few months, mother moved to restrict father's parenting time, alleging that the child was in imminent danger while in his care.  On June 11, 2024, after finding the motion "facially sufficient," the district court temporarily ordered supervised parenting time pending an evidentiary hearing.  *See* § 14-10-129(4), C.R.S. 2025 (upon filing a sufficient section 14-10-129(4) motion, any parenting time must be supervised until an emergency hearing is held within fourteen days); *see also In re*

1

*Marriage of Thorburn*, 2022 COA 80, ¶¶ 28, 32 (section 14-10-129(4) allows a parent to obtain a parenting time restriction on an emergency basis so long as the motion meets the particularity requirement of C.R.C.P. 7(b)(1)).  The court held the hearing fourteen days later, denied the motion, and lifted the restriction.

¶ 4    Next, the district court turned to father's claim that the parties were common law married.  Following a hearing, the court concluded that no common law marriage existed, finding no express agreement to marry and no conduct from which such an agreement could be inferred.

¶ 5    In April 2025, the district court held a permanent orders hearing on the APR.  The court designated mother as the child's primary residential parent during the school year and granted her sole decision-making responsibility over his medical, mental health, and dental care.  Using father's monthly income of $3,768 and assigning him 106 overnights, the court directed him to pay monthly child support of $192.

¶ 6    Father requested post-trial relief under C.R.C.P. 59, which the district court summarily denied.

## II.     Failure to Include Transcripts in the Record on Appeal

¶ 7     About a month before the opening brief was due, father filed a motion in this court acknowledging that he had not ordered transcripts of the relevant hearings.  He asked this court to authorize "supplementation of the record with the transcripts." Because it could not order supplementation unless father had designated and paid for the transcripts, the court ordered father to provide proof of payment for the transcripts.  Father then filed another motion explaining that he could not afford to pay for the transcripts and requested permission to submit a "statement of evidence" and a "sworn narrative" of the proceedings instead.  A three-judge panel denied father's request and ordered that because father had failed to designate and pay for transcripts, the appeal would "proceed without the transcripts."

¶ 8     The next day, father filed his opening brief.  The brief included a section entitled "record status," asserting that the "district court transmitted the record without transcripts."  Father explained that his motion to settle the record was pending.  Father never supplemented the record with the transcripts.

¶ 9     As the appellant, father was obligated to include transcripts of all proceedings necessary for resolution of the issues on appeal. C.A.R. 10(d)(3).  His failure to do so means that we must presume that the missing transcripts support the district court's findings and conclusions.  *See In re Marriage of Beatty*, 2012 COA 71, ¶ 15 (where the record is incomplete, the appellate court must assume that the evidence supports the district court's findings); *see also In re Marriage of Dean*, 2017 COA 51, ¶ 13 ("Where the appellant fails to provide . . . a transcript, the [appellate] court must presume that the record supports the judgment."); *McCall v. Meyers*, 94 P.3d 1271, 1272 (Colo. App. 2004) ("A party cannot overcome a deficiency in the record by statements in the briefs.").

¶ 10    We are mindful, of course, that father is proceeding pro se on appeal.  Regardless, transcript fees cannot be waived by the court. *See* Chief Justice Directive 98-01(III) (amended effective April 2024). And even if father was unaware of the consequences of failing to provide transcripts, he is bound by his decision not to include them in the record on appeal.  *See Rosenberg v. Grady*, 843 P.2d 25, 26 (Colo. App. 1992) (Self-represented litigants must follow procedural

rules and "must be prepared to accept the consequences of [their] mistakes and errors.").

### III. Presentation of Evidence and Discovery

¶ 11    Father contends that the district court's alleged two-and-a-half-hour time limit and failure to rule on a discovery matter "constrain[ed] his presentation" at the hearing. But he does not develop that contention further — in fact, he does not clarify whether he is referring to the common law marriage hearing or the APR hearing — and because there is no transcript of either hearing, we cannot confirm whether there was a time limit; if there was, whether father objected; and, if he did, whether the time limit precluded him from presenting evidence that might have affected the district court's decision. *See, e.g.*, *In re Marriage of Pawelec*, 2024 COA 107, ¶¶ 34, 36 (three-hour time limit for parenting time hearing was not an abuse of discretion when mother's counsel did not object and mother failed to identify any evidence excluded based on the time limit); *see also In re Marriage of Zander*, 2019 COA 149, ¶ 27 (an appellate court may decline to consider an argument not supported by legal authority or any meaningful legal analysis), *aff'd*, 2021 CO 12.

## IV. Common Law Marriage

¶ 12     Father contends that the district court erred by determining that the parties were not common law married.  We disagree.

¶ 13     "[A] common law marriage may be established by the mutual consent or agreement of the couple to enter the legal and social institution of marriage, followed by conduct manifesting that mutual agreement."  *Hogsett v. Neale*, 2021 CO 1, ¶ 70.  "The key inquiry is whether the parties intended to enter a *marital* relationship — that is, to share a life together as spouses in a committed, intimate relationship of mutual support and obligation."  *Id.*

¶ 14     In determining whether a couple entered into a common law marriage, the district court should "accord weight to evidence reflecting [their] express agreement to marry," *id.*, such as a proposal and acceptance, a ceremony, the exchange of vows or rings, or similar formal expressions of intent.  *LaFleur v. Pyfer*, 2021 CO 3, ¶ 54; *see Hogsett*, ¶ 62; *In re Estate of Yudkin*, 2021 CO 2, ¶ 22.

¶ 15     Absent an express agreement, the district court may consider whether one can be inferred from the couple's conduct.  *Hogsett,*

¶ 70. Relevant factors include (1) cohabitation; (2) reputation in the community as spouses; (3) maintenance of joint banking and credit accounts; (4) purchase and joint ownership of property; (5) filing joint tax returns; (6) shared financial responsibilities (like leases in both partners' names, joint bills, or other payment records); (7) joint estate planning, (like wills, powers of attorney, and beneficiary and emergency contact designations); (8) symbols of commitment (like ceremonies, anniversaries, cards, gifts, and the couple's references to or labels for one another); and (9) the parties' sincerely held beliefs about the institution of marriage. *Hogsett,* ¶¶ 55-56.

¶ 16     No single factor is dispositive, *Yudkin,* ¶¶ 18-19; *see also Hogsett,* ¶ 59 (the significance of a given factor will depend on the individual, the relationship, and the broader circumstances, including cultural differences), and the inquiry is fact intensive and dependent on credibility determinations, which are best made by the district court. *LaFleur,* ¶ 50; *see Hogsett,* ¶ 50 (The existence of a common law marriage calls for "a flexible inquiry into the totality of the circumstances that relies on the factfinder's credibility determinations and weighing of the evidence.").

¶ 17    We review the district court's factual findings for clear error and its common law marriage determination for an abuse of discretion. *LaFleur*, ¶ 50. A court's factual finding is clearly erroneous if there is no support for it in the record. *Pawelec*, ¶ 55. The court abuses its discretion when it misconstrues or misapplies the law, or makes a decision that is manifestly arbitrary, unreasonable, or unfair. *In re Marriage of Nevedrova*, 2024 COA 112, ¶ 6.

¶ 18    In denying father's common law marriage claim, the district court made the following findings:

- Based on the parties' demeanor and tone, as well as the substance of their testimony, mother was credible and father less so.

- At no point did either party propose marriage to the other.

- The parties never held a marriage ceremony in front of family or friends.

- The parties did not enter any written agreement expressing an intent to form a common law marriage.

- The parties have a child.

- The parties cohabitated for most of the last thirteen years.

8

- While living together, each party at times dated or pursued relationships with other people.

- Father introduced mother as his wife to two acquaintances.

- The parties referred to each other inconsistently, which suggested that they did not have a reputation in the community as spouses.

- The parties did not jointly own any real property.

- The parties did not have joint bank or credit accounts.

- The parties filed separate tax returns and consistently identified themselves as single or head of household.

- The parties did not sign leases together, and, although father contributed to household expenses, the parties did not have joint bills, or maintain joint payment records.

- The parties did not have joint estate planning documents or name each other as beneficiaries or emergency contacts.

- When mother was a bartender, she sometimes wore a ring but explained that she bought it herself to avoid unwanted attention.

- Father did not wear a ring. He did not dispute that mother bought the ring she sometimes wore at work.

- The parties did not celebrate anniversaries.

- Neither party demonstrated sincerely held beliefs regarding the institution of marriage.

¶ 19    The district court ultimately determined that a common law marriage did not exist.

¶ 20    Pointing to certain evidence, father maintains that the parties were common law married. But even assuming some evidence could have supported a finding of a common law marriage, other evidence amply supports the district court's determination that there was no common law marriage. It is not our role as an appellate court to reweigh the evidence and reach a different conclusion than the district court on the fact-intensive question of whether the parties were common law married. *See Hogsett*, ¶ 21 (upholding the district court's determination that a common law marriage did not exist when, although many indicia of marriage were present, other indicia, which the district court chose to weigh more heavily, were not present).

## V.    APR

¶ 21    Father challenges the district court's APR order on several grounds. We are not persuaded by his arguments.

10

¶ 22    The district court must allocate parental responsibilities in accordance with the best interests of the child. *See* § 14-10-124(1.5), (1.7), C.R.S. 2025. To do so, the court must consider all relevant factors, including those factors identified in section 14-10-124(1.5)(a) and (b). *See In re Marriage of Morgan,* 2018 COA 116M, ¶ 21 (decision-making responsibility); *Collins,* ¶ 7 (parenting time).

¶ 23    The district court has broad discretion when allocating parental responsibilities. *See Morgan,* ¶ 23 (decision-making responsibility); *Collins,* ¶ 8 (parenting time).

¶ 24    Father first argues that the district court failed to "link facts to each [section 14-10-124] factor," rendering its findings insufficient to support the APR. That argument misses the mark for two reasons.

¶ 25    For one thing, the court is not required to make specific findings on each factor so long as there is some indication in the record that it considered the pertinent factors. *See In re Marriage of Garst,* 955 P.2d 1056, 1058 (Colo. App. 1998).

¶ 26    And in any event, the district court made the following findings related to each factor:

- Mother sought to be named the primary residential parent and sole decision-maker for the then fourteen-year-old child while father wanted equal parenting time and joint decision-making responsibility. *See* § 14-10-124(1.5)(a)(I) (the parents' wishes are relevant to the child's best interests).

- The child expressed a desire to spend equal time with his parents, and his relationship with both parents has historically been "strong, loving, [and] consistent." *See* § 14-10-124(1.5)(a)(II) (the child's wishes are relevant to the child's best interests), (III) (interaction and interrelationship of the child with their parents, siblings, and any other person who may significantly affect the child's best interests are relevant to the child's best interests).

- Father committed an act of domestic violence, or had a history of domestic violence, based on mother's credible testimony that he took her phone, pinned her down on a bed, and choked her in front of the child. *See* § 14-10-124(1.5)(a)(III.5) (domestic violence is relevant to the child's best interests); *see also Thorburn*, ¶ 49 (it is for the district court to determine witness credibility and the weight, probative force, and

12

sufficiency of the evidence, as well as the inferences and conclusions to be drawn therefrom).

- The child was very well adjusted to his school and community. *See* § 14-10-124(1.5)(a)(IV) (the child's adjustment to their home, school, and community is relevant to the child's best interests).

- The parents and the child were physically and mentally healthy. *See* § 14-10-124(1.5)(a)(V) (mental and physical health of all individuals involved is relevant to the child's best interests).

- When the parties were at their best, they encouraged the child to spend time with the other party. *See* § 14-10-124(1.5)(a)(VI) (the ability of the parties to encourage the sharing of love, affection, and contact between the child and the other party is relevant to the child's best interests). But when they were not, the parties put the child in the middle by using him to pass along information about the other parent's personal life. *See id.*

- Both parents have a history of being actively involved in the child's life, showing shared values, time commitment, and

mutual support. *See* § 14-10-124(1.5)(a)(VII) (whether the past pattern of involvement of the parties with the child reflects a system, time commitment, and mutual support is relevant to the child's best interests); § 14-10-124(1.5)(b).

- The parties lived just a few blocks from one another. *See* § 14-10-124(1.5)(a)(VIII) (the physical proximity of the parties to each other as that relates to the practical considerations of parenting time is relevant to the child's best interests).

¶ 27    These findings (which, in the absence of a transcript, we must presume were supported by the evidence) are sufficient to support the court's decision to designate mother as the child's primary residential parent and to grant her sole decision-making responsibility concerning the child's medical, mental health, and dental care. We will not reweigh the statutory factors or substitute our judgment for that of the district court. *See In re Marriage of Nelson,* 2012 COA 205, ¶ 35 (When reviewing for an abuse of discretion, even where "there is evidence in the record that could have supported a different conclusion, we will not substitute our judgment for that of the district court.").

14

¶ 28    Next, father argues that the court failed to consider that, before the APR hearing, mother refused to allow him to see the child for over a month — a fact that he says shows mother will not foster his relationship with the child. We presume, however, that the district court considered all the evidence admitted. *See Collins*, ¶ 21.

¶ 29    Finally, father argues that the district court erred by excluding, as "attorney-client privilege[d]," an email from mother's attorney offering to withdraw a civil protection order against him in exchange for certain "custody [and] child support concessions." Though father does not identify the email, we assume he is referencing a January 25, 2025, email to him titled "Offer to Settle – C.R.E. 408." The email from mother's attorney advised father that "[t]his offer is protected under Colorado Rules of Evidence 408, which means the discussions we have concerning settlement cannot be used at any hearing."

¶ 30    "CRE 408 bars the admission at trial of settlement discussions, or offers to compromise a claim, when the evidence is offered to prove liability for, invalidity of, or amount of a disputed claim." *People v. Butson*, 2017 COA 50, ¶ 1, *overruled in part on*

15

*other grounds by*, *Buell v. People*, 2019 CO 27, ¶ 21 & n.2. Settlement offers may be admissible for other purposes, however. *See* CRE 408(b).

¶ 31 Father's brief does not mention CRE 408 or include any legal argument concerning admissibility of the email, except to say that the attorney-client privilege does not extend to communications between a party and opposing counsel. Without the benefit of a transcript, we do not know whether or how the issue was raised at the APR hearing or the court's reason for excluding the email. And father has not explained why exclusion of the email prejudiced him, beyond asserting that the email revealed mother's "motive to fabricate" (presumably the domestic violence allegations) and therefore its exclusion "was not harmless." For all these reasons, his argument is not properly postured for appellate review. *See, e.g.*, *People v. Perez*, 2024 COA 94, ¶ 51 (appellate courts do not consider undeveloped arguments).

¶ 32 In sum, we cannot say that the district court abused its broad discretion in deciding what APR was in the child's best interests. *See Morgan*, ¶ 23; *Collins*, ¶ 8.

## VI. Temporary Parenting Time Restriction

¶ 33    Father's claim of error regarding the district court's June 11, 2024, order, which temporarily restricted his parenting time, is moot. "A claim is moot when the relief sought, if granted, would have no practical legal effect on an actual existing controversy." *Portley-El v. Colo. Dep't of Corr.*, 2022 COA 86, ¶ 18.

¶ 34    The June 2024 order was vacated when the district court denied mother's underlying section 14-10-129(4) motion. And the current APR, which gives father unsupervised parenting time, supersedes the June 2024 order. *See In re Marriage of Salby*, 126 P.3d 291, 295 (Colo. App. 2005) ("[T]emporary orders terminate when permanent orders are entered, and thereafter they may not be appealed."). Thus, because the restriction order has been vacated or replaced and no longer has any legal effect, any opinion about its propriety would be advisory only, "and we must avoid issuing advisory opinions." *Stor-N-Lock Partners #15, LLC v. City of Thornton*, 2018 COA 65, ¶ 38.

¶ 35    We reject father's claim that the issue is not moot because the restriction "colored" the final APR. Nothing in the written order

suggests that the district court relied on the prior restriction when deciding the APR.

## VII. Child Support

### A. Father's Income

¶ 36 Father contends that the district court incorrectly determined his gross income. We disagree.

¶ 37 Child support is calculated by using each party's actual gross income. § 14-10-115(3)(c), (5)(a)(I), C.R.S. 2025. The district court has broad discretion in determining income. *Collins*, ¶ 30.

¶ 38 The district court did not impute income to father. Rather, it determined his actual income based on father's testimony at the APR hearing, which the court considered the "most credible source of information" about his income. According to the court, father testified that he was self-employed and earned $33.50 per hour, working an average of twenty-seven hours per week for fifty weeks per year. In the end, the court found that his gross monthly income was $3,768. Given that the APR hearing transcript is not part of the record, we must presume that the court's income finding is supported by the evidence and is not clearly erroneous. *See Beatty*, ¶ 19.

## B. Number of Overnights

¶ 39 Father contends the district court erred by understating the number of his overnights with the child. Unlike his other challenges, this issue can be resolved without the transcript of the APR hearing. We conclude that additional findings are necessary.

¶ 40 Child support is calculated in part based on the number of overnights that the child will have with each party under a district court's APR. *See* § 14-10-115(8)(b); *Pawelec*, ¶ 82.

¶ 41 In its child support worksheet for shared physical care, the district court calculated father's obligation based on 106 overnights. We cannot tell how the court arrived at that number.

¶ 42 Under the permanent orders, father has parenting time during the school year on the first, second, and third weekends of each month, from Thursday through Sunday. Using a nine-month school year as a reasonable assumption, he would have around eighty-one overnights during the school year. During the summer, he has parenting time on a week-on, week-off basis. If summer is the remaining three months, that schedule results in roughly forty-two additional overnights. The parties also alternate certain holidays each year. Thus, the permanent orders reflect that father

19

has around 123 overnights per year, even before accounting for holidays.

¶ 43    We reverse this portion of the judgment and remand for additional findings on the number of father's overnights. On remand, the court should make sufficiently explicit findings to allow an appellate court a clear understanding of the basis of its decision. *See In re Marriage of Humphries*, 2024 COA 92M, ¶ 43.

### C.    Health Insurance

¶ 44    Father insists that the district court erred by "[c]rediting an employer premium for 'three children' when the child is on Medicaid and the other two [children] are adults." He is mistaken. The court's child support worksheet indicates that a health insurance premium credit was not given to either party.

### VIII.  Attorney Fees

¶ 45    Father contends that the district court "fail[ed] to "rule or make findings on [his] requests for attorney's fees to equalize economic positions." Father was not represented by an attorney at the APR hearing, so we discern no error in the court's decision not to award attorney fees in connection with the APR order. To the extent father sought attorney fees in connection with some other

20

proceeding, he does not explain why the court erred by not addressing that request in the APR order. In fact, he does not cite to the record or provide any facts or legal analysis to guide our review of this claim, and therefore we decline to address it. *Zander*, ¶ 27.

## IX.  C.R.C.P. 59

¶ 46     Father contends that the district court erred by denying his C.R.C.P. 59 motion without making any findings. We disagree. A court may deny a motion to amend or alter its findings without explanation if it concludes that its existing findings and conclusions are proper and sufficient. *See Eitel v. Alford*, 257 P.2d 955, 958 (Colo. 1953); *US Fax Law Ctr., Inc. v. Henry Schein, Inc.*, 205 P.3d 512, 519 (Colo. App. 2009). Moreover, C.R.C.P. 59(j) makes clear that if the court does not rule on such a motion within sixty-three days, the motion is deemed denied, without further findings.

## X.    Disposition

¶ 47     The district court's APR permanent orders are reversed as to child support. The court on remand must make additional findings explaining the number of overnights. The judgment is otherwise affirmed.

JUDGE DUNN and JUDGE MOULTRIE concur.