Opinions of the Colorado Supreme Court are available to the
public and can be accessed through the Judicial Branch's
homepage at http://www.courts.state.co.us.  Opinions are also
posted on the Colorado Bar Association's homepage at
http://www.cobar.org.

ADVANCE SHEET HEADNOTE
January 11, 2021

**2021 CO 1**

**No. 19SC44,** *In re Marriage of Hogsett & Neale*—**Common Law—Divorce—
Marriage and Cohabitation.**

The supreme court revisits the test for proving a common law marriage that

the court articulated over three decades ago in *People v. Lucero*, 747 P.2d 660 (Colo.

1987).  Because many of the indicia of marriage identified in *Lucero* have become

less reliable, particularly in light of the recognition of same-sex marriage and other

social and legal changes, the court refines the test and holds that a common law

marriage may be established by the mutual consent or agreement of the couple to

enter the legal and social institution of marriage, followed by conduct manifesting

that mutual agreement.  The core inquiry is whether the parties intended to enter

a marital relationship—that is, to share a life together as spouses in a committed,

intimate relationship of mutual support and obligation.

In this case, the court applies the refined *Lucero* test and concludes that no

common law marriage existed.  The court therefore affirms the judgment of the

court of appeals.

## The Supreme Court of the State of Colorado

2 East 14th Avenue • Denver, Colorado 80203

## 2021 CO 1

**Supreme Court Case No. 19SC44**
*Certiorari to the Colorado Court of Appeals*
Court of Appeals Case No. 17CA1484

**In re the Marriage of**

**Petitioner:**

Edi L. Hogsett,

v.

**Respondent:**

Marcia E. Neale.

**Judgment Affirmed**
*en banc*
January 11, 2021

**Attorneys for Petitioner:**
Griffiths Law PC
Ann Gushurst
     *Littleto sn, Colorado*

Radman Law Firm, LLC
Diane R. Radman
     *Denver, Colorado*

Aitken Law, LLC
Sharlene J. Aitken
     *Denver, Colorado*

**Attorneys for Respondent:**
Plog & Stein, P.C.
Jessica A. Saldin
Stephen J. Plog
  *Greenwood Village, Colorado*

**Attorneys for Amicus Curiae Family Law Section of the Colorado Bar Association:**
Polidori, Franklin, Monahan & Beattie, LLC
Robin Lutz Beattie
  *Lakewood, Colorado*

Sherr Puttmann Akins Lamb PC
Courtney Radtke McConomy
  *Greenwood Village, Colorado*

Epstein Patierno, LLP
Christina Patierno
  *Denver, Colorado*

**Attorneys for Amici Curiae the Colorado LGBT Bar Association; the Colorado Women's Bar Association; Lambda Legal Defense and Education Fund, Inc.; and the National Center for Lesbian Rights:**
Hogan Lovells US LLP
Mark D. Gibson
  *Denver, Colorado*

**JUSTICE MÁRQUEZ** delivered the Opinion of the Court.
**JUSTICE HART** specially concurs.
**CHIEF JUSTICE BOATRIGHT** concurs in the judgment only.
**JUSTICE SAMOUR** concurs in the judgment only.

¶1    In this case and two others announced today, *In re Estate of Yudkin*, 2021 CO 2, __ P.3d __, and *In re Marriage of LaFleur & Pyfer*, 2021 CO 3, __ P.3d __, we revisit the test for proving a common law marriage that we articulated over three decades ago in *People v. Lucero*, 747 P.2d 660 (Colo. 1987).  In *Lucero*, we held that a couple could establish a common law marriage "by the mutual consent or agreement of the parties to be husband and wife, followed by a mutual and open assumption of a marital relationship."  *Id.* at 663.  We directed that evidence of such agreement and conduct could be found in a couple's cohabitation; reputation in the community as husband and wife; maintenance of joint banking and credit accounts; purchase and joint ownership of property; filing of joint tax returns; and use of the man's surname by the woman or by children born to the parties.  *Id.* at 665.

¶2    Each of the three cases before us involves a disputed common law marriage claim.  Together, they illustrate how much has changed since our decision in *Lucero*.  Notably for purposes of this case and *LaFleur*, same-sex couples may now lawfully marry, *see Obergefell v. Hodges*, 576 U.S. 644 (2015) (holding that states cannot deprive same-sex couples of the fundamental right to marry), though their right to do so was not recognized in Colorado until October 2014, *see LaFleur*, ¶ 30 (describing the timeline of same-sex marriage recognition in Colorado).  Yet the gender-differentiated terms and heteronormative assumptions of the *Lucero* test

3

render it ill-suited for same-sex couples. More broadly, many of the traditional indicia of marriage identified in *Lucero* are no longer exclusive to marital relationships. At the same time, genuine marital relationships no longer necessarily bear *Lucero*'s traditional markers. The lower court decisions in these cases reflect the challenges of applying *Lucero* to these changed circumstances.

¶3    In this case, we refine the test from *Lucero* and hold that a common law marriage may be established by the mutual consent or agreement of the couple to enter the legal and social institution of marriage, followed by conduct manifesting that mutual agreement. The core query is whether the parties intended to enter a *marital* relationship—that is, to share a life together as spouses in a committed, intimate relationship of mutual support and obligation. In assessing whether a common law marriage has been established, courts should accord weight to evidence reflecting a couple's express agreement to marry. In the absence of such evidence, the parties' agreement to enter a marital relationship may be inferred from their conduct. When examining the parties' conduct, the factors identified in *Lucero* can still be relevant to the inquiry, but they must be assessed in context; the inferences to be drawn from the parties' conduct may vary depending on the circumstances. Finally, the manifestation of the parties' agreement to marry need not take a particular form.

¶4 Having refined the *Lucero* test in this case, we clarify in *Yudkin* that whether a common law marriage exists depends on the totality of the circumstances, and no single factor is dispositive. *Yudkin*, ¶ 3. We remand that case to the probate court for reconsideration of the common law marriage claim under the updated framework we announce today. *Id.* at ¶ 24. In *LaFleur*, we hold that a court may recognize a common law same-sex marriage entered in Colorado before the state recognized same-sex couples' right to marry. *LaFleur*, ¶¶ 3–5. There, we apply the refined *Lucero* test and conclude that the parties did enter a common law marriage, but we set aside the property division and spousal maintenance award and remand for further proceedings. *Id.* at ¶ 6.

¶5 In this case, we apply the refined *Lucero* test and conclude that the record supports the district court's conclusion that no common law marriage existed. Accordingly, we affirm the judgment of the court of appeals.

## I. Facts and Procedural History

### A. Initial Petition and Separation Agreement

¶6 Edi L. Hogsett and Marcia E. Neale were in a thirteen-year relationship from November 2001 to November 2014. The two women never formally married (and

could not have done so in Colorado until October 2014).[1]  Nevertheless, in January 2015, they jointly filed a pro se petition for dissolution of marriage in Arapahoe County District Court.  The parties mediated a separation agreement stating that they had entered a common law marriage on December 1, 2002, and that their marriage was irretrievably broken.

¶7     The separation agreement included a division of the parties' purported marital property, including their home, furniture and household goods, bank accounts, stock purchase plans, retirement plans, vehicles, pets, and other miscellaneous assets, and provided for the division of their debts and obligations. It also required Neale to pay Hogsett $1,000 in monthly "spousal maintenance" for about seven years.

¶8     At the initial status conference, the court explained that it would have to find that a marriage existed before it could address the petition for dissolution. The parties reported that they did not have a marriage or civil union license and stipulated to dismissal of the petition, explaining that, through mediation, they had "fully settled all issues they had wanted to address in a dissolution case," and

---

[1] *See LaFleur*, ¶ 30 (describing the timeline of cases invalidating Colorado's constitutional and statutory same-sex marriage exclusions).

that they "would be able to implement their [agreement] between themselves [without] court involvement." The case was dismissed.

¶9 Hogsett later sought certain retirement assets and maintenance she believed Neale owed her under their separation agreement. Neale communicated to Hogsett her position that no marriage existed between them. Hogsett then filed a second petition for dissolution of marriage that is the subject of this case. Neale moved to dismiss, asserting, as relevant here, that the parties were never married under common law.

## B. District Court's Ruling

¶10 At a hearing on Neale's motion to dismiss, the district court heard testimony from Neale, Hogsett, and several of their friends, relatives, and associates. The court also considered documentary and photographic evidence of the parties' relationship. It ultimately concluded that Hogsett had not met her burden to prove a common law marriage under the test in *Lucero*, 747 P.2d at 663–65.

¶11 In its detailed oral ruling, the district court first acknowledged what we confirm today in *LaFleur*: that it could recognize a common law same-sex marriage entered in Colorado before the state recognized same-sex couples' fundamental

7

right to marry. *See LaFleur*, ¶ 3.[2] But the court also acknowledged the difficulty of applying *Lucero* to the parties' same-sex relationship:

> [T]he elements set forth in *Lucero* for the [c]ourt to consider, in many ways, do not reflect the reality of the situation for same-sex couples prior to [*Obergefell*]. Gay marriage was illegal so no matter if a couple intended to be married, they couldn't take advantage of the many privileges that were afforded to heterosexual couples. They couldn't use the word spouse on taxes; on financial documentation; they couldn't mark the other partner as spouse or wife on medical forms.

The court remarked that additional guidance from higher courts in these circumstances would be "very helpful," but in the absence of such guidance, the court proceeded to apply *Lucero*.

¶12    In doing so, the court observed that certain *Lucero* factors were of limited or no use in the context of a same-sex relationship, while others were less relevant today than when *Lucero* was decided. The court acknowledged, for example, that the parties bought a custom home together, but it accorded that factor less weight given that cohabitation between unmarried partners is far more prevalent today. The court also observed that in a same-sex marriage, there would be no use of a husband's surname by a wife, but it reasoned that this factor was not particularly relevant in any event, given that many spouses today elect not to change their

---

[2] Because neither party here contests *Obergefell*'s retroactive application, that question is not before us in this case.

names. The court further noted that it did not believe the parties had any option to file joint tax returns before same-sex couples could legally marry.

¶13 The court then turned to conflicting evidence related to a marriage ceremony and exchange of rings. Hogsett testified that she and Neale exchanged custom wedding rings in a "very intimate close marriage ceremony" at a bar. In contrast, Neale testified that she believed they were merely exchanging commitment rings, and that there were no family members or friends present. The court concluded there was "evidence of [an] agreement of a committed relationship" but reasoned that the parties might have had different understandings of the significance of the ceremony and exchange of rings. The court noted that neither party referred to the other as wife or mentioned marriage in the letters and cards they exchanged. The question, the court reasoned, was whether the parties did not use the words "married" or "wife" because of the state of the law at the time, or because they had no intention of being married.

¶14 Turning to other evidence, the court observed that the parties had joint ownership of property, had joint banking and credit card accounts, and had worked with a financial advisor as a couple to manage and preserve their assets. It also found that Hogsett had listed Neale as a primary beneficiary and domestic partner on her 401(k) and as next of kin and life partner on a medical record. But Hogsett had also certified on a health insurance form that she was "not married."

¶15 The court disagreed with Hogsett's argument that the parties' initial joint petition for dissolution of marriage served as conclusive evidence that the parties were married. It credited Neale's testimony that she had acted on bad advice that she had to file for divorce in order to separate the parties' significantly intertwined finances. The court also noted that the date of marriage specified on the petition did not match the date the parties had consistently celebrated as their anniversary and found it significant that the parties jointly dismissed the case shortly after filing it. Ultimately, the court concluded that the original petition for dissolution "cut[] both ways."

¶16 Turning to reputation in the community, the court found that only Hogsett had described the relationship as a marriage or had ever referred to Neale as her wife. However, the court again wondered whether this could have been attributable to marriage being unrecognized for same-sex couples at the time.

¶17 In the end, the court found "credible evidence . . . that [Hogsett] believed that she was married to [Neale]." But it also found "credible evidence that [Neale] did not believe that she was married" to Hogsett. It noted that Neale testified that she "do[esn't] believe in marriage" because she "do[esn't] believe two people can promise each other that they're going to love each other for the rest of their lives." Moreover, Neale "never referred to [Hogsett] as her wife; never told anyone she was married; [and] never listed married or intent to be married on any legal,

10

financial, or medical documents." Accordingly, although it acknowledged the case was "extremely difficult," the court held that Hogsett had not met her burden to establish a common law marriage by a preponderance of the evidence and granted Neale's motion to dismiss.

## C. Court of Appeals' Ruling

¶18 The court of appeals affirmed, concluding that the district court did not err in applying *Lucero* to find that no common law marriage existed. *In re Marriage of Hogsett & Neale*, 2018 COA 176, ¶¶ 3, 11, __ P.3d __.

¶19 The division noted that record evidence supported both Hogsett's belief that she was married and Neale's belief that she was not. *Id.* at ¶ 20. It acknowledged Hogsett's argument that many indicia of marriage were present, including the parties' intertwined finances, the existence of joint accounts, and their joint ownership of a home. *Id.* at ¶ 21. But it also pointed out that other evidence showed there was no common law marriage, including the parties' joint dismissal of the initial petition for dissolution, Neale's testimony that she didn't believe in marriage, and the absence of references to marriage in the parties' private correspondence. *Id.* at ¶¶ 19, 21. It also noted that the parties did not attempt to marry in a state where same-sex marriage had been legalized. *Id.* at ¶ 21. Ultimately, the division affirmed the lower court's judgment, reasoning that the

11

district court had discretion in weighing this evidence and that its findings were supported by the record. *Id.* at ¶¶ 15, 21.

¶20 In reaching this conclusion, the division reasoned that *Obergefell* applies retroactively in determining the existence of a common law marriage. *Id.* at ¶¶ 22–25. It also acknowledged that "the only reason that many of *Lucero*'s indicia of marriage were unavailable to the parties is because of unconstitutional laws forbidding same-sex marriage." *Id.* at ¶ 22. But it concluded that the district court had "appropriately recognized and accorded less weight to [the *Lucero*] factors that were less relevant" in the context of the parties' same-sex relationship, *id.* at ¶ 20, and that competent record evidence supported the crucial finding that Neale did not consent to a marriage, *id.* at ¶ 25.

¶21 In a special concurrence, Judge Furman wrote separately "to encourage our legislature to abolish common law marriage, in conformity with the majority of jurisdictions." *In re Marriage of Hogsett & Neale*, 2018 COA 176, ¶ 35, __ P.3d __ (Furman, J., specially concurring). He argued that common law marriage determinations place a needlessly heavy burden on the parties and our courts. *Id.* He also reasoned that, because Colorado citizens have physical and legal access to licensed marriage and because children born to unmarried parents are now afforded the same rights and privileges as those born to married parents, common law marriage is no longer practically or legally necessary. *Id.* at ¶ 36.

12

¶22    We granted Hogsett's petition for a writ of certiorari to address how courts should determine the existence of a common law marriage between same-sex partners.[3]  In considering that question and those posed by the two other cases before us, we necessarily revisit our common law marriage jurisprudence more broadly.

## II.  Analysis

¶23    We begin by observing that marriage carries not only a great array of legal rights, benefits, and obligations, but also bears personal, social, expressive, and religious meanings.  We next explain the two legal paths to marriage in Colorado, distinguishing common law marriage from licensed marriage.  We acknowledge that Colorado is one of the few remaining states to recognize common law marriage and that there is some skepticism of its current utility.  After reviewing the test for proving a common law marriage set forth in *Lucero*, we examine how social and legal changes since that decision have eroded its usefulness in distinguishing marital from nonmarital unions.  Finally, we refine the *Lucero* test

---

[3] We granted certiorari to review the following issues:

1. What factors should a court consider in determining whether a common law marriage exists between same-sex partners?

2. Whether the court of appeals erred in affirming the trial court's conclusion that no common law marriage existed between the same-sex couple here.

13

to account for these changed circumstances and, applying the new framework here, we conclude that there was no common law marriage in this case.

### A. Background

### 1. The Significance of Marriage

¶24 Marriage touches both life and death. Courts have catalogued the numerous significant protections, benefits, and obligations that flow from civil marriage. *See, e.g.*, *United States v. Windsor*, 570 U.S. 744, 771–74 (2013) (discussing some of the more than 1,000 federal laws and regulations referencing marriage); *Goodridge v. Dep't of Pub. Health*, 798 N.E.2d 941, 955–57 (Mass. 2003) (discussing benefits and obligations that turn on marital status under Massachusetts law). Indeed, the legal ramifications of a couple's marital status are abundant; they arise under federal, state, and local law and span the civil and criminal realm. A couple's marital status has implications in civil, domestic, and probate cases, and even plays a role in some criminal offenses.[4]

---

[4] For just a few examples of the legal consequences of marriage, see 8 U.S.C. § 1154 (2018) (permitting married U.S. citizens to petition for immigration status for their foreign-born spouses); 26 U.S.C. § 6013 (2018) (allowing married couples to file federal taxes jointly); 42 U.S.C. § 416 (2018) (providing federal old-age, survivors, and disability insurance benefits to spouses); § 13-90-107(1)(a), C.R.S. (2020) (establishing scope of the marital privilege); § 14-10-113, C.R.S. (2020) (requiring equitable division of marital property upon divorce); § 15-11-102, C.R.S. (2020) (providing for spousal intestate succession); § 18-5-102(1)(d), C.R.S. (2020) (prohibiting forgery of false tax returns); § 18-6-201(2), C.R.S. (2020) (specifying

¶25 Of course, "marriage is more than a routine classification for purposes of certain statutory benefits." *Windsor*, 570 U.S. at 769. The right to marry has been recognized as fundamental, *Loving v. Virginia*, 388 U.S. 1, 12 (1967), and marriage has been the wellspring of other constitutionally protected rights, *see, e.g.*, *Skinner v. Oklahoma ex rel. Williamson*, 316 U.S. 535, 541 (1942) (procreation); *Griswold v. Connecticut*, 381 U.S. 479, 485 (1965) (contraception). As "a far-reaching legal acknowledgment of the intimate relationship between two people," *Windsor*, 570 U.S. at 769, marriage "bestows enormous private and social advantages on those who choose to marry," *Goodridge*, 798 N.E.2d at 954. Marriage represents "a deeply personal commitment to another human being . . . and the decision whether and whom to marry is among life's momentous acts of self-definition." *Id.* at 954–55. Indeed, for many couples, marriage is a sacred religious bond. *Obergefell*, 576 U.S. at 656–57 ("Marriage is sacred to those who live by their religions and offers unique fulfilment to those who find meaning in the secular realm.").

---

that bigamy is a class 6 felony); § 18-6-301(1), C.R.S. (2020) (making it a class 4 felony to knowingly marry an ancestor or descendant); § 19-4-105, C.R.S. (2020) (presuming parentage of both spouses for child born to married couple); and Denver Rev. Mun. Code § 18-412 (providing group health insurance coverage for retirees' spouses).

¶26 Because marriage triggers a cascade of legal rights, benefits, and obligations, and is laden with great historical, social, religious, and personal meaning, the determination of a couple's marital status is of great consequence.

## 2. Licensed Marriage and Common Law Marriage

¶27 Courts have long viewed marriage as a civil contract requiring the parties' mutual agreement. *Meister v. Moore*, 96 U.S. 76, 78 (1877) ("Marriage is everywhere regarded as a civil contract."); *Taylor v. Taylor*, 50 P. 1049, 1049 (Colo. App. 1897) ("By the statutes of Colorado, marriage is declared to be a civil contract; and there is only one essential requirement to its validity, between parties capable of contracting, viz. the consent of the parties.").

¶28 In Colorado, a legally recognized marriage can be achieved two ways: formally, by fulfilling the statutory requirements of licensed marriage, or informally, by entering a common law marriage through mutual agreement of the parties followed by assumption of a marital relationship. *See In re Peters' Est.*, 215 P. 128, 129 (Colo. 1923) ("The statutes provide a method of contracting marriage. That method is not exclusive."); *see also Lucero*, 747 P.2d at 665 (setting forth essential requirements of a common law marriage). Couples seeking a licensed marriage must pay a marriage license fee, obtain approval of the license, and return the marriage certificate and license within sixty-three days of

solemnization.  §§ 14-2-105 to -109, C.R.S. (2020).  Common law marriage, by contrast, lacks these formalities solemnizing the relationship.

¶29    Historically, recognition of common law marriage allowed children of such unions to be treated as legitimate and prevented abandoned or widowed women from turning to the public fisc for their support.  Ariela R. Dubler, *Wifely Behavior: A Legal History of Acting Married*, 100 Colum. L. Rev. 957, 969–71 (2000).  The doctrine protected vulnerable spouses, typically women, who invested in and relied on long-term relationships that were never formalized and whose "contributions of labor and commitment . . . were not embodied in money, property, or title."  Cynthia Grant Bowman, *A Feminist Proposal to Bring Back Common Law Marriage*, 75 Or. L. Rev. 709, 711 (1996); *see also Lucero*, 747 P.2d at 664 (observing that common law marriage "serves mainly as a means of protecting the interests of parties who have acted in good faith as husband and wife").

¶30    Common law marriage also provides a path to marriage for marginalized groups such as undocumented immigrants who, as noted by amicus curiae Colorado Legal Services in *Yudkin*, may wish to avoid divulging information to government authorities implicating their immigration status.  And as pointed out by amici the Colorado LGBT Bar Association, et al. in *LaFleur*, common law marriage may be particularly important for same-sex partners who lived as married couples for years but could not marry formally.

¶31     Conversely, as Judge Furman described in his special concurrence below, many believe the doctrine has outlived its usefulness given the general accessibility of licensed marriage, the trend toward more egalitarian marriages, and the law's equal treatment of children born to unmarried parents. *See Hogsett*, ¶¶ 35–36 (Furman, J., specially concurring); *see also Stone v. Thompson*, 833 S.E.2d 266, 267 (S.C. 2019) (concluding that the foundations of common law marriage "have eroded with the passage of time"). Certainly, as the record here reflects, the inquiry is fact-intensive and invasive and forces judges to assess the degree to which a couple's conduct conforms to a marital ideal. Indeed, the common law marriage doctrine holds relationships to standards that some licensed marriages might not meet if similarly scrutinized.[5]

¶32     Although abolition of common law marriage is not before us today, we note that a majority of states have abolished the doctrine. *See, e.g.*, Ala. Code § 30-1-20(a) (1975) (prohibiting parties from entering into a common law marriage on or after January 1, 2017); 23 Pa. Cons. St. § 1103 (declaring that common law

---

[5] The substantive limitations on licensed marriage are few: Colorado prohibits marriages between parties under eighteen years of age (except with judicial approval), § 14-2-106(1)(a)(I), C.R.S. (2020), and marriages that involve one party who is in another valid marriage or civil union; marriages between a descendant and ancestor; marriages between siblings; and marriages between an uncle or aunt and their niece or nephew, § 14-2-110, C.R.S. (2020). Beyond these limitations, the state simply accepts a licensed marriage as valid.

18

marriages contracted after January 1, 2005 are invalid); *Stone*, 833 S.E.2d at 87 (prospectively abolishing common law marriage in South Carolina through judicial decision). Indeed, Colorado and only nine other jurisdictions continue to allow for the formation of common law marriages.[6]

## B. *People v. Lucero*

¶33 We set forth the prevailing test for establishing a common law marriage in Colorado more than three decades ago in *People v. Lucero*, a criminal case in which the defendant objected to the admission of testimony from his alleged common law wife on grounds that it violated the marital privilege codified at section 13-90-107(1)(a), C.R.S. (1973). 747 P.2d at 661–62. Although the defendant made an offer of proof consisting of his putative wife's testimony that she considered herself married to him and that the couple held themselves out as married, the trial court overruled the objection, deeming the proffered testimony insufficient to prove the common law marriage. *Id.* at 662.

¶34 On review, we held that a common law marriage is established by "the mutual consent or agreement of the parties to be husband and wife, followed by a

---

[6] Eight other states (Iowa, Kansas, Montana, New Hampshire, Oklahoma, Rhode Island, Utah, and Texas) and the District of Columbia still recognize common law marriage. 1 Karen Moulding & National Lawyers Guild, *Sexual Orientation and the Law* § 2:9 n.15 (2020 Update).

mutual and open assumption of a marital relationship." *Id.* at 663. We observed that the "very nature of a common law marital relationship makes it likely that in many cases express agreements will not exist," and thus held that when "the agreement is denied or cannot be shown, its existence may be inferred from evidence of cohabitation and general repute." *Id.* at 664.

¶35 Our opinion emphasized that "[a] determination of whether a common law marriage exists turns on issues of fact and credibility, which are properly within the trial court's discretion." *Id.* at 665. For guidance, we identified certain conduct reflecting a couple's agreement, pointing foremost to cohabitation and the couple's general reputation in the community as husband and wife. *Id.* at 664. We explained that courts may also consider other behavior, including "maintenance of joint banking and credit accounts; purchase and joint ownership of property; the use of the man's surname by the woman; the use of the man's surname by children born to the parties; and the filing of joint tax returns." *Id.* at 665. We nevertheless made clear that "any form of evidence that openly manifests the intention of the parties that their relationship is that of husband and wife will provide the requisite proof." *Id.* Because it was unclear by what criteria the trial court evaluated the existence of the common law marriage, we remanded the case for reconsideration under the clarified standard. *Id.*

## C. Challenges Presented by *Lucero*

¶36 Although *Lucero* sought to provide a flexible framework for evaluating the existence of a common law marriage, the factors we identified in 1987 have become, over time, less reliable markers to distinguish marital from nonmarital relationships. Of particular relevance here, some of the evidence called for in *Lucero* is of limited use in evaluating a same-sex relationship, particularly one predating Colorado's recognition of same-sex marriage. But more broadly, as the three cases before us today make clear, many of the traditional indicia of marriage identified in *Lucero* are no longer exclusive to marital relationships, while at the same time, bona fide marriages today do not always bear *Lucero*'s traditional markers. In short, social and legal changes since *Lucero* make its factors less helpful in sorting out who is "acting married," and who is not.

### 1. *Lucero* Is Underinclusive of Common Law Same-Sex Marriages

¶37 First, by its gendered language, *Lucero* precludes recognition of same-sex relationships. It requires a finding that the parties agreed to be "husband and wife" and, for evidence of such agreement, looks to factors including the parties' reputation in the community as "husband and wife" and the use of the "man's surname by the woman" or by children born to the parties. *Id.* at 663–65. *Lucero*'s heteronormative view of marriage can no longer stand. *Obergefell*, 576 U.S. at 675–76 (holding invalid state laws "to the extent they exclude same-sex couples

from civil marriage on the same terms and conditions as opposite-sex couples"); *LaFleur*, ¶ 5 (holding *Obergefell* applies retroactively). To their credit, the lower courts in this case and in *LaFleur* took pains to apply *Lucero* to the same-sex relationships before them in gender-neutral terms.

¶38 But the mismatch between the *Lucero* test and the claims of same-sex spouses is not limited to its gendered terms. We agree with amici the Colorado LGBT Bar Association, et al. that several of the *Lucero* factors raise a barrier to the recognition of bona fide common law same-sex marriages given the history of same-sex couples' inability to marry and the continuing risks faced by many individuals for being in a same-sex relationship openly. Moreover, our holding today in *LaFleur* that same-sex partners may show that they entered a common law marriage before the state recognized their right to marry does not alter the reality that such a marriage may be difficult to prove under the factors identified in *Lucero*.

¶39 For example, same-sex couples will be unable to show that they filed taxes as a married couple or listed their partners as "spouses" on beneficiary designations or other formal documents before same-sex marriage was legally recognized. And although other *Lucero* criteria are not impossible for same-sex couples to meet, they may be unrealistic, impracticable, or even dangerous. Most notably, *Lucero*'s "holding out" requirement that couples publicly affirm their

22

marital status fails to account for the precarious legal and social status LGBTQ people and their relationships have occupied for most of this nation's history.[7]

¶40 Given this reality, for some same-sex couples, "[a] truthful declaration . . . of what was in their hearts had to remain unspoken," *Obergefell*, 576 U.S. at 660, or their marital intent was conveyed in non-traditional ways, *see, e.g.*, Br. for Resp't at 3, *Windsor v. United States*, 570 U.S. 744 (2013), (No. 12-307) (noting that Windsor had proposed to her late wife with a diamond brooch instead of a diamond ring to "avoid unwelcome questions about the identity of [her] 'fiancé'"). In short, the

---

[7] As the U.S. Supreme Court recognized in *Obergefell*, until recently, "[s]ame-sex intimacy remained a crime in many [s]tates. Gays and lesbians were prohibited from most government employment, barred from military service, excluded under immigration laws, targeted by police, and burdened in their rights to associate." 576 U.S. at 661. Same-sex intimacy was not decriminalized across the country until 2003, *see Lawrence v. Texas*, 539 U.S. 558, 578 (2003); nationwide recognition of same-sex marriages came only in 2015, *see Obergefell*, 576 U.S. at 644; and it was not until this past summer that the Court ruled that to fire someone on the basis of their sexual orientation or gender identity violates Title VII, *see Bostock v. Clayton Cnty.*, 140 S. Ct. 1731, 1737 (2020).

Colorado is no exception to this history. In 1992, Colorado voters approved an amendment to the state constitution, later invalidated by the U.S. Supreme Court in *Romer v. Evans*, 517 U.S. 620 (1996), that sought to prevent any branch or political subdivision of the state from protecting persons against discrimination based on sexual orientation. It was not until 2008 that LGBTQ Coloradans found protection in state law from discrimination in employment, housing, and public accommodations, *see* § 14-15-102, C.R.S. (2020), and not until the Designated Beneficiaries Agreements Act of 2009 that same-sex relationships were bestowed any formal recognition by the state, *see* § 15-22-102, C.R.S. (2009).

*Lucero* test is ill-adapted to assess whether a same-sex couple has entered into a common law marriage.

## 2. The *Lucero* Factors No Longer Mark a Reliable Boundary Between Marital and Nonmarital Unions

¶41 Second, and more broadly, public norms have evolved since 1987. As a result, the factors we offered in *Lucero* to distinguish between marital and nonmarital relationships have become less reliable markers of that boundary.

¶42 Today, many unmarried couples live together. *Stone*, 833 S.E.2d at 269 ("[N]on-marital cohabitation is exceedingly common and continues to increase among Americans of all age groups."). Indeed, this court recognized the growing frequency of nonmarital cohabitation two decades ago. *Salzman v. Bachrach*, 996 P.2d 1263, 1267 (Colo. 2000) (noting the number of unmarried-couple households had increased 571% from 1970 to 1993 (citing Bureau of the Census, *Marital Status and Living Arrangements: March 1993*, VII–VIII, tbl.D (May 1994))). In response to that sea change in social norms, we announced the enforceability of contracts between unmarried cohabiting couples, *id.*, while at the same time cautioning that "mere cohabitation does not trigger any *marital* rights," *id.* at 1269 (emphasis added). In other words, since *Lucero*, we have recognized that cohabitation is no longer synonymous with marriage.

¶43 The trend we observed two decades ago in *Salzman* has continued: The share of adults living with an unmarried partner has more than doubled since 1995, and

24

majorities across age groups now share the view that it is acceptable for a couple to live together even if they never plan to marry. Juliana Menasce Horowitz, Nikki Graf, & Gretchen Livingston, *Marriage and Cohabitation in the U.S.*, Pew Rsch. Ctr., (Nov. 6, 2019), https://www.pewsocialtrends.org/2019/11/06/marriage-and-cohabitation-in-the-u-s/#fn-26816-1 [https://perma.cc/RR6Z-25MK]. At the same time, it is becoming more common and technologically feasible for spouses to live apart. Sue Shellenbarger, *The Long-Distance Marriage That's Built to Last*, Wall St. J. (Aug. 14, 2018), https://www.wsj.com/articles/the-long-distance-marriage-thats-built-to-last-1534252845 [https://perma.cc/8F87-RZUB] (describing recent census data indicating the practice of married people living apart has risen 44% since 2000 to 3.96 million). In sum, we can no longer assume that cohabitation "clearly show[s] an intention to be married," *Lucero*, 747 P.2d at 665, or that living apart necessarily disproves the existence of a marriage.

¶44 Nor is marriage today necessarily a prerequisite to procreation. Childrearing outside marriage has become increasingly common. Gretchen Livingston, *The Changing Profile of Unmarried Parents*, Pew Rsch. Ctr., (April 25, 2018), https://www.pewsocialtrends.org/2018/04/25/the-changing-profile-of-unmarried-parents/ [https://perma.cc/NFH9-ALM9] ("One-in-four parents living with a child in the United States today are unmarried."). And, as Judge Furman observed, children born to unmarried parents are no longer denied the

rights of children born to married parents. *Hogsett*, ¶ 36 (Furman, J., specially concurring); *see also, e.g.*, § 19-4-103, C.R.S. (2020) (providing that for purposes of the Uniform Parentage Act, "[t]he parent and child relationship extends equally to every child and to every parent, regardless of the marital status of the parents"); ch. 96, sec. 1, 2018 Colo. Sess. Laws 752, 752 ("eliminat[ing] and moderniz[ing] the outdated use of the terms 'illegitimate child' or 'legitimate child' or related terms" in the Colorado Revised Statutes). For that matter, parentage today takes many forms; married or not, many parents have children through adoption, §§ 19-5-201 to -203, C.R.S. (2020) (permitting individual, marital, stepparent, and second-parent adoption), or assisted reproductive technologies, *see In re Marriage of Rooks*, 2018 CO 85, 429 P.3d 579. Finally, just as having shared biological or genetic children is not an indicator of marriage, it is also not a requirement of marriage. *See Obergefell*, 576 U.S. at 646 ("Precedent protects the right of a married couple not to procreate, so the right to marry cannot be conditioned on the capacity or commitment to procreate."). In short, whether a couple has or raises children together is not necessarily indicative of a marriage.

¶45 The same is true for couples' name-changing practices. The custom cited in *Lucero* of a woman adopting her husband's surname dates back to the doctrine of coverture, wherein "the very being or legal existence of the woman [was] suspended during the marriage." 1 William Blackstone, Commentaries *430.

26

Today, the choice to take a partner's surname, combine surnames, or share a newly created surname together remains common and meaningful among both different-sex and same-sex spouses. *See, e.g.*, Vicki Valosik, *For Same-Sex Couples, Changing Names Takes on Extra Significance*, The Atlantic (Sept. 27, 2013), https://www.theatlantic.com/national/archive/2013/09/for-same-sex-couples-changing-names-takes-on-extra-significance/279841/ [https://perma.cc/LBA3-LNVV]; Suzannah Weiss, *Creating a Name for Themselves*, N.Y. Times (March 11, 2020), https://www.nytimes.com/2020/03/11/fashion/weddings/name-change-after-marriage-not-always-easy.html [https://perma.cc/F6HC-WT72]. But there may be any number of reasons, including cultural ones, that spouses and children do not take one partner's name at marriage. *See* Suzanne A. Kim, *Marital Naming/Naming Marriage: Language and Status in Family Law*, 85 Ind. L.J. 893, 910–12 (2010) (discussing studies demonstrating that major determinants of name change upon marriage include age at marriage, geographical region, gender role traditionalism, career orientation, and educational attainment).

¶46 A couple's financial arrangements may also be less telling these days than before. "[C]ouples make varying arrangements regarding their finances, such that the maintenance of 'largely separate finances' is a far less salient consideration than it might have been in years past." *Gill v. Nostrand*, 206 A.3d 869, 882 (D.C. 2019); *see also* Caroline Kitchener, *Why More Young Married Couples Are Keeping*

*Separate Bank Accounts*, The Atlantic (Apr. 20, 2018), https://www.theatlantic.com/family/archive/2018/04/young-couples-separate-bank-accounts/558473/ [https://perma.cc/4ZTG-8J6P] (discussing generational changes in spouses' choices to intermingle finances). Moreover, as noted by amicus curiae Colorado Legal Services in *Yudkin*, low-income individuals may not have bank accounts or own a home and therefore may be unable to prove a common law marriage through a joint deed or mortgage. Similarly, low-income couples may choose to title property in only one spouse's name because of credit issues.

¶47 Finally, the traditions and symbols that mark marital and nonmarital commitments are not uniform. Not every expression of commitment to a partner constitutes an agreement to enter a *marital* relationship. Nor does every marriage ceremony involve an officiated exchange of vows before family and friends at a place of worship.[8]

¶48 In sum, the markers identified in *Lucero* have become less reliable indicators of a marital relationship. On the one hand, the *Lucero* factors may be overinclusive

---

[8] In Colorado, for example, a couple could formally marry by self-solemnizing at the top of Sugarloaf Mountain, placing their pet's paw print on the witness signature to the union, and identifying the wedding location on the marriage certificate in GPS coordinates.

of couples who lack intent to be married yet engage in conduct once associated only with spouses. On the other hand, the factors may be underinclusive of genuine marriages that don't conform to a traditional model.

## D. Proving a Common Law Marriage in Colorado

¶49 Given these significant social and legal developments since our decision in *Lucero*, the test and its factors require refinement. We therefore hold that a common law marriage may be established by the mutual consent or agreement of the couple to enter the legal and social institution of marriage, followed by conduct manifesting that mutual agreement. The key question is whether the parties mutually intended to enter a *marital* relationship — that is, to share a life together as spouses in a committed, intimate relationship of mutual support and mutual obligation. In assessing whether a common law marriage has been established, courts should give weight to evidence reflecting a couple's express agreement to marry. In the absence of such evidence, the parties' agreement to enter a marital relationship may be inferred from their conduct. When examining the parties' conduct, the factors identified in *Lucero* can still be relevant to the inquiry, but they must be assessed in context; the inferences to be drawn from the parties' conduct may vary depending on the circumstances. Finally, the manifestation of the parties' agreement to marry need not take a particular form.

¶50    Our refinement retains the core parts of the *Lucero* test: the centrality of the couple's mutual consent or agreement to marry, the requirement of some manifestation of that consent, and a flexible inquiry into the totality of the circumstances that relies on the factfinder's credibility determinations and weighing of the evidence.  We emphasize that, as was true under *Lucero*, a mutual agreement to marry does not alone suffice; there must be some evidence of subsequent conduct manifesting that agreement.  *See* 747 P.2d at 663.

¶51    But in light of the Supreme Court's decision in *Obergefell*, we discard *Lucero's* gendered language.  In addition, we conclude that the conduct manifesting the parties' agreement to marry need not take the form of "mutual public acknowledgment," *id.*, or "open marital cohabitation" in every case, *id.* at 664 (quoting Homer Clark, *Law of Domestic Relations* 48 (1968)).  There may be cases where, particularly for same-sex partners, a couple's choice not to broadly publicize the nature of their relationship may be explained by reasons other than their lack of mutual agreement to be married.  We are satisfied that in such cases, a general requirement to introduce "some objective evidence of the relationship" will sufficiently guard against fraudulent assertions of marriage.  *Id.* (quoting Clark, *supra*, at 48).

¶52    Finally, the refined test reflects that it is more difficult today to say that a court will know a marriage when it sees one.  Indeed, Colorado recognizes in civil

30

unions a legal relationship wholly separate from marriage notwithstanding that civil unions entail virtually the same "benefits, protections, and responsibilities afforded by Colorado law to spouses." § 14-15-102, C.R.S. (2020).

¶53 Given this reality, the refined test emphasizes the importance of the parties' *mutual* agreement to enter a *marital* relationship. Whatever deep transformations marriage has undergone, *see Obergefell*, 576 U.S. at 660, we have consistently recognized it as a civil contract requiring the mutual assent of the parties.

¶54 Parties asserting a common law marriage need not prove that they had detailed knowledge of and intent to obtain all the legal consequences that attach to marriage. As we hold today in *LaFleur*, ¶¶ 32, 37, a same-sex couple in particular need not show intent to enter a marriage the state would have recognized at the time as lawful. Instead, the essential inquiry is whether the parties mutually intended to enter a marital relationship. As noted, courts should accord weight to evidence of the couple's express agreement to marry, but in the absence of such evidence, the couple's mutual intent may be inferred from their conduct, albeit judged in context.[9]

---

[9] Discerning the intent of a same-sex couple may require particular care. Before formal same-sex marriage was recognized, many same-sex couples expressed their commitment through the exchange of rings or in ceremonies ranging from the simple to the elaborate. But such acts of commitment varied widely; to

31

¶55    The conduct we identified in *Lucero* can still be relevant to this inquiry. Although we disavow *Lucero*'s heteronormative terms like "husband and wife," other factors, such as the parties' cohabitation, reputation in the community as spouses, maintenance of joint banking and credit accounts, purchase and joint ownership of property, filing of joint tax returns, and use of one spouse's surname by the other or by children raised by the parties may still be considered as evidence manifesting the couple's intent to be married.

¶56    In addition, a court should consider: evidence of shared financial responsibility, such as leases in both partners' names, joint bills, or other payment records; evidence of joint estate planning, including wills, powers of attorney, beneficiary and emergency contact designations; and symbols of commitment, such as ceremonies, anniversaries, cards, gifts, and the couple's references to or labels for one another. Courts should also consider the parties' sincerely held beliefs regarding the institution of marriage.

¶57    While the inquiry should focus on the couple's conduct and attitude during the relationship, a party's behavior when a relationship ends may be instructive. For example, a partner who asserts a common law marriage years after the couple

---

automatically ascribe marital intent to them without examining other circumstances of the relationship fails to appreciate the diversity of attitudes in the LGBTQ community toward the institution of marriage.

broke up has a less credible claim than one who promptly asserts spousal status for dissolution or probate purposes. In addition, conduct inconsistent with marriage that occurs as a relationship is breaking down does not negate a finding of common law marriage where there is evidence of the parties' earlier mutual agreement to be married. In other words, infidelity, physical separation, or other conduct arising as the relationship is ending does not invalidate a couple's prior mutual agreement to enter a common law marriage.

¶58 Finally, a court generally must establish the date of any common law marriage. We note that ordinarily, where a legal impediment prevents an otherwise valid marriage (e.g., where one of the parties is already married to another person), the effective date of the marriage is the date the legal impediment is removed. However, the former exclusion of same-sex couples from marriage cannot constitute a legal impediment because that exclusion has been held unconstitutional. *See LaFleur*, ¶¶ 4, 33–35.

¶59 In sum, courts may continue to look to the parties' conduct for evidence of an implied agreement to marry. But *Lucero*'s assumption that the presence of a particular factor necessarily supports a finding of marriage (or that its absence necessarily weighs against a finding of marriage) can no longer hold. Instead, the inferences to be drawn from the parties' conduct will vary depending on the circumstances. In some cases, the presence of a factor is persuasive evidence of

marriage (e.g., the taking of a partner's last name following a ceremony), while its absence is of no significance. In other cases, the absence of a factor is telling (e.g., the fact that a couple *never* cohabitated), while the presence of that factor is unhelpful. Finally, the significance of a given factor will depend on the individual, the relationship, and the broader circumstances, including cultural differences. For example, one same-sex couple's use of the label "partner" may convey "spouse," while another's may not. In Spanish-speaking communities, a person's use of the reference "mujer" may or may not convey "wife." *Mujer*, Real Academia Española, *Diccionario de la Lengua Española*, 23d ed., https://dle.rae.es/mujer [https://perma.cc/84A9-4YNQ] (defining "mujer" as both "person of the female sex" and "wife or female partner"). The court must consider the evidence in all its context. *See, e.g.*, *Gill*, 206 A.3d at 879–80 (explaining the trial court's finding that the absence of a ceremony or honeymoon supported an inference against marriage, not because those celebrations are traditional, but in light of evidence of how the parties and their community signified important events).

¶60 We recognize that common law marriage determinations present difficult, fact-intensive inquiries. But we have full faith that our judges, who interact daily with Colorado families in all their diversity, can fairly make these sensitive assessments.

34

### E. Applying the Refined Framework, the Parties Did Not Mutually Intend to Enter into a Common Law Marriage

¶61 Applying our revised framework for evaluating a common law marriage to this case, we conclude that the record supports the trial court's conclusion that the parties did not mutually intend to enter a marital relationship and thus, Hogsett failed to meet her burden to establish the existence of a common law marriage.

¶62 We begin by reviewing evidence of an express agreement to marry. Hogsett testified that the parties exchanged custom wedding rings before friends and patrons at a bar, but later "backtracked and agreed" that only bar patrons were present. She was unable to confirm the exact date of the ring exchange. Neale, in contrast, testified that the parties merely exchanged rings "[t]o express commitment to the relationship," that it was "nothing significant," and that there were no family or friends present. As noted above, the traditions and symbols that mark marital commitments are not uniform; it is possible that an impromptu, intimate exchange of rings in a bar can be a marriage ceremony if the parties mutually intend it to be. Here, the district court found the evidence of this ceremony only partially helpful; it found there was evidence of a committed relationship but that the parties had different interpretations of the significance of the ring exchange.

¶63 Because the evidence of an express agreement to marry is inconclusive, we turn to evidence of the parties' conduct to determine if such an agreement may be

inferred. Considering the totality of the circumstances and viewing the evidence in context, we conclude that the record supports the district court's determination that there was no mutual agreement of the parties to enter into a marital relationship.

¶64 Hogsett and Neale never celebrated the date of the ring exchange as an anniversary; they did not wear their rings consistently; and they never referred to each other as wife or mentioned marriage in letters and cards they exchanged. True, it is possible that the couple did not celebrate the ring exchange as an anniversary or refer to each other as spouses because they were not and could not be formally married at the time. But they never privately celebrated the ring exchange as a key date in their relationship, and in communications with third parties, including family and long-time friends, only Hogsett ever referred to Neale as her wife or described the relationship as a marriage. Here, there is no evidence that the parties chose to hide the true nature of their relationship for fear of disapproval or discrimination.

¶65 The parties did cohabitate and bought a custom home together, had joint banking and credit accounts, and went to a financial advisor to manage and preserve their assets as a couple. This evidence tends to demonstrate a committed relationship of mutual support and obligation, but it is not necessarily dispositive proof of a marital relationship, given the modern trends noted above regarding

unmarried couples' varying financial arrangements. Hogsett also listed Neale as a primary beneficiary and domestic partner on her 401(k) and as next of kin and life partner on a medical record, indicating an intent to have a legally recognized relationship. Neale, however, did not make any similar designations.

¶66 Some of the evidence does not point in either direction. For example, Hogsett's certification on a health insurance form that she was "not married" is of little significance, as the option to be formally married in Colorado was not legally available at the time. For the same reason, the parties' failure to file joint tax returns during that time contributes little to the inquiry. Notably, we disagree with the court of appeals' suggestion that the parties' failure to attempt to get married in a state where same-sex marriage was legal weighs against a finding of common law marriage. *Hogsett*, ¶ 21. A couple's decision not to formally marry does not reflect lack of intent to enter a common law marriage.

¶67 As discussed above, the parties' behavior after the relationship ends may be instructive. Here, Hogsett points to the parties' petition for dissolution of marriage and their mediated separation agreement as evidence that they had agreed to be married. It is true that Neale was the one to suggest "divorce" to Hogsett and that Neale signed the petition and separation agreement without refuting the existence of a marriage. That said, the district court credited Neale's testimony that she "was given bad advice" and thought she was required to file

37

for dissolution in order to separate their finances. Moreover, the parties acknowledged at their initial status conference in that proceeding that they had "no marriage or civil union license" and then jointly and promptly dismissed the action. In short, the filing of the initial petition for dissolution and the parties' separation agreement is not conclusive evidence that the parties intended to enter a common law marriage.[10]

¶68 Returning to the core query, it is clear that both parties were in a committed, intimate relationship for thirteen years. Nevertheless, to establish a common law marriage, there must be mutual intent to enter a marital relationship. Although Hogsett testified that she had such intent, the record reflects that Neale did not.

¶69 Neale testified that she "do[es]n't believe in marriage. [She] do[es]n't believe two people can promise each other that they're going to love each other for the rest of their lives." And importantly, Hogsett confirmed that Neale expressed to her that "she doesn't believe in marriage because she believes that there's . . . a higher power than that." The district court thus made a credibility determination that Neale "never asked to be married, . . . doesn't believe in

---

[10] We reject Hogsett's reliance on appeal on the parol evidence rule. The court of appeals declined to consider this contention because it was raised for the first time on appeal. *Hogsett*, ¶¶ 26–27. Even assuming that this contention was preserved, the trial court properly considered the extrinsic evidence proffered by both parties to determine whether there was a mutual agreement to be married.

marriage[, and] doesn't believe that two people can be in . . . love their whole life." In sum, while Hogsett may have intended to be married, there is insufficient evidence to conclude such intent was mutual, despite both parties' clear commitment to each other and other indicia of a marital relationship. Accordingly, we conclude that there was no common law marriage and affirm the court of appeals' judgment.[11]

## III. Conclusion

¶70 Today we refine the test from *Lucero* and hold that a common law marriage may be established by the mutual consent or agreement of the couple to enter the legal and social institution of marriage, followed by conduct manifesting that mutual agreement. The key inquiry is whether the parties intended to enter a *marital* relationship—that is, to share a life together as spouses in a committed, intimate relationship of mutual support and obligation. In assessing whether a common law marriage has been established, courts should accord weight to evidence reflecting a couple's express agreement to marry. In the absence of such evidence, the parties' agreement may be inferred from their conduct. When examining the parties' conduct, the factors identified in *Lucero* can still be relevant

---

[11] We decline to consider Hogsett's "estoppel by contract" argument as we agree with the court of appeals that this contention was not properly preserved. *Hogsett*, ¶ 27.

to the inquiry but must be assessed in context; the inferences to be drawn from the parties' conduct may vary depending on the circumstances. Finally, the manifestation of the parties' agreement to marry need not take a particular form. Applying this refined test here, we hold the record supports the trial court's conclusion that there was no mutual intent of the parties to enter into a common law marriage. Accordingly, we affirm the judgment of the court of appeals. Hogsett's request for attorney's fees and costs is denied.

**JUSTICE HART** specially concurs.
**CHIEF JUSTICE BOATRIGHT** concurs in the judgment only.
**JUSTICE SAMOUR** concurs in the judgment only.

JUSTICE HART, specially concurring.

¶71    I fully join the majority opinion in this case, as well as in *In re Estate of Yudkin*, 2021 CO 2, __ P.3d __, and *In re Marriage of LaFleur & Pyfer*, 2021 CO 3, __ P.3d __, because the opinions offer helpful refinement of the common law marriage test to be applied to those common law marriages that have already been entered. I write separately to express my concerns regarding the validity of common law marriage going forward. The historic conditions that once justified the need for the doctrine are no longer present, its application is often unpredictable and inconsistent, and it ties parties and courts up in needlessly costly litigation. It is my view that Colorado should join the overwhelming majority of states and abolish it.

¶72    Common law marriage travelled to colonial America from England, where it had been a creature of English common law. *See* Cynthia Grant Bowman, *A Feminist Proposal to Bring Back Common Law Marriage*, 75 Or. L. Rev. 709, 719–20 (1996). While not recognized in every jurisdiction, it was recognized in many American states and territories, including Colorado. There are numerous explanations for the wide acceptance of common law marriage in the early decades of the nation. Many posit that frontier America was difficult to travel and sparsely populated, making it unduly complicated for a couple wishing to marry to reach a religious or government official who could perform a formal wedding. *See id.* at 722–24. Common law marriage was also deemed necessary because of prevailing

1

moral judgments about unwed mothers and children born out of wedlock. And it was used as a way to situate financial responsibility for indigent women with their common law husbands rather than with the "public fisc." *See* maj. op. ¶ 29.

¶73 Today's world looks very different—socially, legally, and practically—than the world did when common law marriage was a majority rule among the states. "The paternalistic motivations underlying common-law marriage no longer outweigh the offenses to public policy the doctrine engenders." *Stone v. Thompson*, 833 S.E.2d 266, 269 (S.C. 2019). Acceptance in society is no longer dependent on one's marital status or that of one's parents. *See Marriage of Hogsett*, 2018 COA 176, ¶ 36, __ P.3d __ (Furman, J., specially concurring). And Colorado is hardly the frontier state it once was. Even residents in our most rural counties have ready access to the legal infrastructure for a licensed marriage. The process is quick and simple with minimal cost. *See* §§ 14-2-104 to -109, C.R.S. (2020).

¶74 As the justifications for common law marriage have receded, social norms surrounding romantic relationships and childrearing have changed and the acceptance of non-marital cohabitation and co-parenting has increased. *See* maj. op. ¶¶ 42–43. Moreover, many couples choose to cohabit or otherwise enter long-term partnerships that look very much like marriages, but with absolutely no desire or intention to participate in the institution of marriage. The majority opinion refines our common law marriage analysis to account for these and other

2

developments. *Id.* at ¶¶ 49–59. But there is no doubt these modern trends have made it more difficult for a layperson to understand what constitutes a common law marriage. In prospectively abolishing common law marriage in its state, the South Carolina Supreme Court noted that this confusion has transformed the doctrine into a "mechanism which imposes marital bonds upon an ever-growing number of people who do not even understand its triggers." *Stone*, 833 S.E.2d at 270; *see also* Br. of Amicus Curiae Colorado Legal Services, at 24, *In re Estate of Yudkin*, 2021 CO 2 (noting the confusion surrounding common law marriage, as a result of which "common law marriage is 'over-diagnosed' by many supportive services entities, who may recommend that individuals be safe and file a court case that may necessitate court and lawyers' fees that might never have been required"). As modern relationship trends evolve, the incongruity between the doctrine and the behavior and expectations of the public will become only greater and it will grow increasingly difficult "to say that a court will know a marriage when it sees one." Maj. op. ¶ 52.

¶75 Perhaps not surprisingly, then, although many states once recognized common law marriage, today Colorado is one of only ten jurisdictions to do so. *See id.* at ¶ 32. Most of those states have prospectively eliminated common law marriage through legislative enactment, though in some states the courts have weighed in to disapprove this common law doctrine. *See id.*; *see, e.g.*, *Stone*,

3

833 S.E.2d at 270 (noting both that many states had abolished the doctrine legislatively and that the elimination of common law marriage in South Carolina would be prospective only); *PNC Bank Corp. v. Workers' Comp. Appeal Bd.*, 831 A.2d 1269, 1279 (Pa. Commw. Ct. 2003) (explaining the court's view that common law marriage should no longer be recognized). In Colorado, common law marriage has been incorporated into statutory law only to the limited extent that section 14-2-109.5, C.R.S. (2020), requires that parties to a common law marriage be at least eighteen years old and that the marriage not violate any of the prohibitions set forth in section 14-2-110, C.R.S. (2020). Given these limited statutory provisions, I believe that the courts could take up the question of whether to continue to recognize common law marriage. The better course, however, would be for the General Assembly to consider whether the doctrine should be prospectively abolished in the state. *See Marriage of Hogsett*, ¶¶ 35–36.

¶76    A guiding principle of our system of justice should be to promote consistent, predictable, and just outcomes. *First Nat'l Bank v. Rostek*, 514 P.2d 314, 318 (Colo. 1973). Our common law marriage analysis is often at odds with this commitment. As we see in the trilogy of cases we decide today, "courts struggle mightily to determine if and when parties expressed the requisite intent to be married." *Stone*, 833 S.E.2d at 269. Further, the fact-intensive inquiry required is lengthy and expensive and delves into sensitive areas of the parties' lives. Requiring those who

4

wish to be married in Colorado to obtain a marriage license would remedy these issues and provide a bright-line rule for courts to rely on.

¶77 For these reasons, I urge the legislature to abolish the common law marriage doctrine.

CHIEF JUSTICE BOATRIGHT, concurring in the judgment only.

¶78 "[T]he cardinal principle of judicial restraint [is that] if it is not necessary to decide more, it is necessary not to decide more." *PDK Lab'ys Inc. v. U.S. Drug Enf't Admin.*, 362 F.3d 786, 799 (D.C. Cir. 2004) (Roberts, J., concurring in part and concurring in the judgment). Today, the majority announces new factors for establishing common law marriage even though those factors are ultimately irrelevant under the circumstances of this case: Both Marcia Neale and Edi Hogsett testified that Neale *did not intend to be married*, and the district court made a credibility determination that Neale "never asked to be married, . . . doesn't believe in marriage[, and doesn't] believe that two people can be in . . . love their whole life [sic]." Therefore, the couple's relationship indisputably did not satisfy the fundamental common law marriage requirement of "mutual intent to enter a marital relationship," maj. op. ¶ 68, and no factors—new or old—can change that reality. Thus, in my view, the majority decides more than is necessary because the record clearly evinces—without considering any factors—that no common law marriage existed. And in deciding what it need not, the majority also potentially broadens the definition of marriage in a way that I fear will only further confuse the already complex concept of common law marriage. Because I agree, however, with the majority's ultimate conclusion that Neale and Hogsett did not enter into a common law marriage, I respectfully concur in the judgment only.

1

¶79 The majority repeatedly affirms the long-held principle that a common law marriage exists only with "mutual consent or agreement of the couple to enter the legal and social institution of marriage." *Id.* at ¶ 3; *see also* 52 Am. Jur. 2d Marriage § 39 (2020) ("For a common-law marriage to be formed, there *must* be a mutual intent to be married, as well as a mutual consent." (emphasis added) (footnote omitted)). Intent to be married forms the cornerstone of every marriage, common law or otherwise—in fact, it is "[t]he core query" in proving a common law marriage. Maj. op. ¶ 3. In that regard, the majority is correct.

¶80 Despite the majority's repeated emphasis on the vital nature of marital intent, however, it glosses over the reality that the factors for establishing common law marriage need only be employed when there exists credible disagreement as to the parties' intent. Indeed, the very purpose of using factors to examine the parties' conduct is to ascertain their intent. *See id.* at ¶ 54 ("[I]n the absence of [an express agreement to marry], the couple's mutual intent [to enter a marital relationship] may be inferred from their conduct . . . ."); *see also Estate of Yudkin*, 2021 CO 2, ¶ 23, __ P.3d __ ("The purpose of examining the couple's conduct is . . . to *discover* their intent."). If one party claims, for example, that both she and her partner intended to be married, but her partner denies such intent, then a court should look at the parties' relevant conduct to determine whether the denying partner actually possessed such intent. In other words, the factors for establishing

2

common law marriage become relevant only when there exists a credible disagreement between the parties about their intent to be married. If, however, there exists no credible disagreement, then the factors are irrelevant.

¶81 Here, the record makes clear that there exists no credible disagreement about Neale and Hogsett's mutual intent to be married—a fact the majority acknowledges when it says that the court "found 'credible evidence that [Neale] did not believe that she was married' to Hogsett." Maj. op. ¶ 17. In point of fact, Neale testified that she never believed in marriage, and Hogsett admitted that she was aware of this belief throughout the duration of her relationship with Neale, testifying that "[Neale] doesn't believe in marriage because she believes that there's something, a higher power than that." Although many of the factors under the now-superseded *Lucero* standard weighed in favor of finding a common law marriage, the district court correctly concluded that no common law marriage existed because it found credible Neale's assertion that she "never asked to be married, . . . doesn't believe in marriage[, and doesn't] believe that two people can be in . . . love their whole life [sic]."

¶82 In my view, the district court's finding should obviate any further inquiry into whether Neale and Hogsett entered into a common law marriage. This is particularly true considering that the determination of parties' intent to marry "relies on the factfinder's credibility determinations and weighing of the

3

evidence." Maj. op. at ¶ 50. The district court made those credibility determinations, weighed the evidence, and found no mutual intent to be married. That absence of mutual intent to be married is dispositive. The inquiry should end. The majority, however, presses on.

¶83 The structure of the majority's analysis, itself, speaks against applying the factors on these facts. After finding evidence of an express agreement to marry "inconclusive," the majority evaluates evidence under several of the new factors. *Id.* at ¶¶ 63–67. This exercise yields little: only the undisputed conclusion that "both parties were in a committed, intimate relationship for thirteen years." *Id.* at ¶ 68. Then, circling back to the beginning and "[r]eturning to the core query," the majority re-emphasizes that "there must be mutual intent to enter a marital relationship." *Id.* Then, relying *not on the factors* but on Neale's testimony that she did not believe in marriage and Hogsett's testimony acknowledging Neale's views, the majority ultimately explains that, "while Hogsett may have intended to be married, there is insufficient evidence to conclude such intent was mutual, despite both parties' clear commitment to each other and other indicia of a marital relationship." *Id.* at ¶ 69. Therefore, the majority finds that Neale and Hogsett did not enter into a common law marriage. *Id.*

¶84 To announce new factors on these facts—which, as the majority demonstrates, do not require application of the factors—violates the cardinal

4

principle of judicial restraint. To be clear, I take no issue with the new factors announced by the majority, themselves, and I appreciate the majority's desire to update the test for establishing common law marriage. But what I do take issue with is that the majority's announcement of those factors *on these facts* obscures and confuses the purpose of applying common law marriage factors: to help a court determine whether the parties intended to be married. It is a futile exercise to apply factors to determine such intent when every party—including the party who has the burden of proving common law marriage—agrees that the intent to be married never existed. I worry that the majority needlessly directs courts to engage in a factor-based analysis, even in cases with—as here—an undisputed lack of "mutual consent or agreement of the couple to enter the legal and social institution of marriage." *Id.* at ¶ 3.

¶85 I also worry that the majority potentially broadens the definition of marriage in a way that will cause additional confusion. The majority equates intent to enter into a marital relationship with intent to be together "in a committed, intimate relationship of mutual support and obligation." *Id.* But while a marital relationship and a "committed, intimate relationship of mutual support and obligation" certainly overlap, they are not necessarily the same. In fact, relationships in which one or both of the parties do not intend to be married could potentially satisfy this definition of marriage. The majority, itself, acknowledges

5

as much.  Indeed, while reasoning that Neale and Hogsett's cohabitation, purchase of a home, and joint financial accounts "tend[] to demonstrate" a "committed, intimate relationship of mutual support and obligation," the majority ultimately concludes that these factors "[are] *not necessarily dispositive* proof of a marital relationship," *id.* at ¶ 65 (emphasis added), and finds that the parties did not enter into a common law marriage.  *Id.* at ¶ 69.

¶86  In addition to causing confusion, further defining marriage is also unnecessary.  As the Supreme Court of New Jersey recognized, when partners announce they are married, no further explanation is necessary, because "[w]hen you say that you are married . . . everyone can instantly relate to you and your relationship [and others] don't have to wonder what kind of relationship it is or how to refer to it or how much to respect it."  *Lewis v. Harris*, 908 A.2d 196, 226 (N.J. 2006).  In other words, marriage is marriage.

¶87  In sum, I do not think it appropriate for the majority to announce new factors for establishing common law marriage on these facts.  Neale and Hogsett's relationship indisputably did not satisfy the fundamental requirement of mutual intent, and I worry that the factors announced by the majority as well as the potential broadening of the definition of marriage will only further confuse the already complex concept of common law marriage.  Because I agree, however,

with the majority's ultimate conclusion that Neale and Hogsett did not enter into

a common law marriage, I respectfully concur in the judgment only.

JUSTICE SAMOUR, concurring in the judgment only.

¶88     For the reasons articulated in my dissenting opinion in the companion case of *In re Marriage of LaFleur & Pyfer*, 2021 CO 3, __ P.3d __ (Samour, J., dissenting), I respectfully concur in the judgment only.  I recognize that *Obergefell v. Hodges*, 576 U.S. 644 (2015), requires us to treat our state's ban on same-sex marriage during the relevant timeframe as though it never existed.  But even so, and even assuming, alternatively, *Obergefell*'s retroactive application, I would conclude that Edi L. Hogsett and Marcia E. Neale could not have mutually intended or agreed to enter into the *legal* relationship of marriage in Colorado between December 2002 and November 2014.  *See LaFleur*, ¶ 76.  Because *Obergefell* was not announced until June 2015, Hogsett and Neale could not have intended or agreed to be in a legally sanctioned marriage.  As a matter of law, neither *Obergefell*'s effect on our state law nor *Obergefell*'s retroactive application can transform Hogsett and Neale's mutual intent and agreement at the time they exchanged rings in 2002.

¶89     Only after *Obergefell* rendered our state's prohibition on same-sex marriage unconstitutional in June 2015 could Hogsett and Neale have mutually intended and agreed to enter into the *legal* relationship of marriage.[1]  *See LaFleur*, ¶ 77.  And,

--------

[1] The majority notes in *In re Marriage of LaFleur & Pyfer*, 2021 CO 3, __ P.3d __, that in 2014, eight months before *Obergefell*, two Tenth Circuit cases out of Utah and

because common law marriage in Colorado requires mutual intent and agreement to enter into the *legal* relationship of marriage, I would hold that, as a matter of law, Hogsett and Neale could not have entered into a common law marriage during the relevant timeframe. *See id.* at ¶¶ 76–77.

¶90    I would therefore affirm the court of appeals' judgment on different grounds than the majority. Accordingly, I concur in the judgment only.

---

Oklahoma had effectively declared Colorado's prohibition on same-sex marriage unconstitutional. *Id.* at ¶ 30 (indicating that "Colorado began to recognize same-sex marriages" in October 2014, just days before Hogsett and Neale ended their relationship). Be that as it may, given the way we framed the question we agreed to review in *LaFleur*, I assume for purposes of this dissent that Colorado's prohibition on same-sex marriage became unconstitutional when *Obergefell* was penned in June 2015.